**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

            v.

CHI TONG KUOK, AKA Yoko
Chong, AKA Eddy, AKA Yoko
Kawasaki, AKA Edison Kuok,
AKA James Kuok,
                    *Defendant-Appellant.*

No. 10-50444

D.C. No.
3:09-cr-02581-
BEN-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted
October 13, 2011—Pasadena, California

Filed January 17, 2012

Before: Harry Pregerson and Jay S. Bybee, Circuit Judges,
and Glen H. Davidson, Senior District Judge.*

Opinion by Judge Bybee

---

*The Honorable Glen H. Davidson, Senior District Judge for the U.S.
District Court for the Northern District of Mississippi, sitting by designa-
tion.

## COUNSEL

Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, California, for the appellant.

Peter Ko, Assistant U.S. Attorney, San Diego, California, for the appellee.

## OPINION

BYBEE, Circuit Judge:

Chi Tong Kuok was convicted after a jury trial on four counts of conspiracy and attempt to export defense articles without a license, money laundering, and conspiracy and attempt to smuggle goods from the United States. Kuok raises a variety of challenges to his conviction and sentence. We

first conclude that venue was proper in the Southern District of California. We disagree with Kuok that the Arms Export Control Act violates the nondelegation principle. We next conclude that Kuok's conviction on count three must be vacated as a matter of law, because attempting to cause an export of a defense article is not a federal crime. Likewise, Kuok's conviction on count four must be vacated for lack of jurisdiction. Finally, because the district court should have allowed Kuok to present evidence of duress to the jury, we reverse and remand for a new trial on counts one and two. Given this disposition, we do not reach Kuok's arguments regarding his sentence.

I

Kuok is a citizen of Macau, a special administrative region of the People's Republic of China and, until recently, a colony of Portugal. For roughly a decade, Kuok engaged in efforts to import protected defense articles from the United States into China, without the licenses required by law. In the summer of 2009, his activities caught up with him, and Kuok was arrested by U.S. Immigration and Customs Enforcement ("ICE") agents at the Atlanta airport. The indictment, filed in July 2009, charged, in count one, conspiracy to export items on the U.S. Munitions List without the required license and conspiracy to buy items knowing they were intended for export in violation of law. 18 U.S.C. §§ 371, 554(a); 22 U.S.C. § 2778(b)(2). Count two charged Kuok with buying a KG-175 Taclane encryptor knowing that it was "intended for exportation contrary to . . . law." 18 U.S.C. § 554(a). Count three charged Kuok with attempting to export the encryptor from the United States without the required license. 22 U.S.C. § 2778(b)(2); 22 C.F.R. § 127.1(a)(1). Count four charged Kuok with transmitting $1700 in funds with the intent to promote the carrying on of "specified unlawful activity": the smuggling and the export offenses charged in counts two and three. 18 U.S.C. § 1956(a)(2)(A).

At trial, the government presented evidence that, over the course of a two-and-a-half year period between 2006 and 2009, Kuok tried to purchase from vendors in the United States various types of communication equipment commonly used by the U.S. military. The government's investigation began in December 2006 when Kuok approached a British company to obtain materials for a device used to transfer data to and from aircraft. Kuok's contact at the company referred the case to ICE, who proceeded to investigate Kuok via undercover agents. As part of the investigation, ICE subpoenaed Kuok's eBay records and discovered that Kuok had purchased two-way radios from a Los Angeles seller. After raiding the seller's home, undercover ICE agents took over and continued to discuss transactions for similar equipment with Kuok. Kuok eventually grew suspicious of the undercover agents, and broke off negotiations. ICE continued in this vein, opening several other investigations into Kuok's eBay activity and tracking him via undercover agents until Kuok broke off communications.

The crux of the government's case lies in the encryptor described in the indictment—a device called the KG-175 Taclane Encryptor offered for sale on eBay by an Arizona company. Kuok's attempts to purchase the device prompted another investigation by undercover ICE agents, who pretended to be willing to sell this device to Kuok. Kuok arranged for a money order transfer to pay for the encryptor. The encryptor never showed up, and the undercover agent claimed it had been confiscated in customs in Alaska. Despite Kuok's repeated suspicions that he was dealing with law enforcement, he arranged to meet the agent in Panama to obtain the encryptor. Kuok promptly informed his contact that he would be traveling through Atlanta to get to Panama, which—unsurprisingly—resulted in his arrest in the Atlanta airport.

At trial, Kuok did not dispute the facts described above, nor the government's evidence that the items Kuok purchased or

attempted to purchase required a license to export them from the United States—a license which Kuok did not possess. Kuok also did not dispute that he knew his actions violated U.S. law. Rather, Kuok's entire defense strategy rested on a theory of duress.

Defense counsel raised the issue of duress in his opening statement. He described the facts supporting the duress defense to the jury, explaining that Kuok had lived in Macau all his life. Kuok started his own business in 2000, installing and maintaining building management systems. A few years before he opened this business, Kuok developed contacts with a businessman who identified himself as a Chinese cultural official, Kung Pen Zheng. Zheng began asking Kuok to buy items from abroad that could not be obtained in China, and Kuok cooperated in order to develop this business contact. The items were available on eBay, and Kuok generally had no problems acquiring them, but troublingly, it would often take a long time for Zheng to pay Kuok back.

According to Kuok's counsel, what started out as a friendly relationship turned serious at one business dinner, when Zheng—after encouraging Kuok to drink to excess—pressured Kuok into signing a note promising to locate and purchase certain items that could not be obtained in China. The next day, Kuok realized that he might be in a bad situation and attempted to back out by telling Zheng that his wife was ill and work needed his attention. Zheng reminded Kuok that he had signed the contract promising to find these items. Zheng then contacted Kuok's wife, who was surprised to hear that she was supposed to be ill. Kuok—who had never given Zheng his home telephone number—was unhappy when he heard about Zheng's phone call to his wife, and spoke to Zheng again later that day. Zheng asked Kuok why he had lied, and Kuok asked Zheng not to call his wife again. Zheng replied: "Why? Are you afraid we're going to hurt her?" Kuok interpreted this as a clear threat to harm his family, but by that point he knew that the threat was coming from the

Chinese government itself and that he could not go to the local police, who were under the Chinese government's control.

According to counsel, Kuok's situation only escalated from there: he was presented with reports detailing his wife's comings-and-goings, and her employer's name and address. Kuok was shown reports of this type for the next several years, as well as photos of himself with his wife and child out in public, with the clear implication that his family was being tracked. Zheng even sent Kuok a gift after the birth of his son, although Kuok had never told Zheng that his wife was pregnant.

Around 2002, Zheng stopped being subtle. He explained to Kuok that others were doing the same things Kuok was being made to do, and if they refused, a family member would be arrested and held in a "black jail"—where the Chinese government sends people to "take [them] off the grid." In 2005, Kuok first learned that his actions could violate U.S. export laws. He went to Zheng again and asked to stop. Zheng refused to let him out of the deal, instead telling Kuok that he had no choice. In 2007, Kuok was diagnosed with a tumor and hospitalized for a week, again begging to be let out of Zheng's schemes, but still Zheng refused.

After opening statements concluded, Kuok made a Brady request for any materials in the government's possession that would support his duress defense. The government objected to the *Brady* request, and the district court denied it as untimely.[1] The government also objected to the duress defense on the

---

[1] The government had no notice of the duress defense, and the request would have entailed a continuance of the trial. *See United States v. Hayes*, 120 F.3d 739, 743 (8th Cir. 1997) ("The defendants offered no good cause for waiting six months [two days after the start of their trial] to request this alleged *Brady* material."). We express no opinion, however, on the merits of the issue should a timely request occur on remand.

grounds that Kuok should have given notice of his defense before trial.[2] The district court ordered the parties to brief the duress issue. The government argued that there was insufficient evidence to support the duress defense, and the district court agreed. Kuok filed a motion to reconsider, which contained a more detailed proffer of the defense case. For instance, he claimed that Zheng told Kuok that if his wife were taken to a black jail, she would be harmed and might not ever return. Kuok also asserted that he had attempted to tell the ICE agents at the airport that he had been forced to act. Finally, Kuok added details explaining how he knew that Zheng and the other officials worked for the Ministry of State Security, China's equivalent of the CIA.

The district court denied the motion for reconsideration. The case proceeded to trial, and the jury found Kuok guilty on all counts. Prior to sentencing, Kuok served another *Brady* request on the government, asking for evidence to support an imperfect duress defense. The district court denied the request. At sentencing, the district court calculated the applicable Guidelines range to be 63 to 78 months. The district court varied upward and sentenced Kuok to 96 months on counts two through four, and 60 months on count one, to run concurrently. This appeal followed.

II

We first address Kuok's claims common to all counts: that venue in the Southern District of California was improper, and the statutory export control regime violates the nondelegation doctrine.[3] Our review of both claims is de novo, *United*

---

[2]On appeal, the government does not brief the claim that the duress defense should be excluded because pretrial notice was not given.

[3]Although Kuok raises the nondelegation argument in the context of count three, it is clear that this argument is common to all counts, which arise under or depend in some way on the validity of the Arms Export Control Act.

*States v. Bozarov*, 974 F.2d 1037, 1040 (9th Cir. 1992) (non-delegation doctrine); *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1059 (9th Cir. 2000) (venue), and we reject Kuok's arguments.

A

**[1]** Kuok challenges venue on counts two through four, which are based on Kuok's purchase of the Taclane encryptor.[4] The Constitution requires that venue lie in the state and district where a crime was committed. U.S. Const. art. III, § 2, cl. 3; U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18. "The burden of establishing proper venue by a preponderance of the evidence rests with the government." *Ruelas-Arreguin*, 219 F.3d at 1060. The government argues that venue was plainly proper in the Southern District of California, because the undercover ICE agent withdrew funds in a San Diego bank from Kuok's money transfer.

---

[4]At the close of the government's case, Kuok made a general motion for a judgment of acquittal, which the district court kept under submission. Kuok only explicitly raised the venue issue in briefing following the jury's verdict. The government raises a non-frivolous argument that Kuok has therefore waived his challenge to venue. This turns out to be a complex issue, given the state of the law in this circuit. *See United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1060 (9th Cir. 2000) ("[V]enue objections made at the close of the government's case-in-chief are timely if the defect in venue is not apparent on the face of the indictment."); *United States v. Powell*, 498 F.2d 890, 891 (9th Cir. 1974) ("[V]enue may be waived, and where, as here, the objection was not raised until after the jury had returned its verdict of guilty, we find that waiver did in fact occur." (citation omitted)); *Gilbert v. United States*, 359 F.2d 285, 288 (9th Cir. 1966) (general motion for acquittal, when "specifically limited" to grounds other than venue, does not preserve a timely venue objection); *Hanson v. United States*, 285 F.2d 27, 28-29 (9th Cir. 1960) (holding that venue must be raised before the close of the government's case, and disagreeing with the appellant's contention that a "timely motion for a directed verdict of acquittal" preserved the challenge). Because we think that Kuok's venue objection is easily disposed of on the merits, we do not deal with the waiver issue.

Kuok argues that venue is not proper because the government manufactured venue in the Southern District of California by its own activities. This argument fails. Kuok cites two cases in support of his argument, neither of which even mention the word "venue." *See United States v. Coates*, 949 F.2d 104, 106 (4th Cir. 1991) ("'[M]anufactured jurisdiction' cannot form the basis for a federal prosecution."); *United States v. Archer*, 486 F.2d 670, 681 (2d Cir. 1973) ("Whatever Congress may have meant by [18 U.S.C.] § 1952(a)(3), it certainly did not intend to include a telephone call manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime."). Both cases deal with manufacturing jurisdiction for a crime, which is a distinct question from the manufacturing of venue. In fact, the Fourth Circuit has distinguished *Coates* on this very ground: "There is no such thing as 'manufactured venue' or 'venue entrapment.'" *United States v. Al-Talib*, 55 F.3d 923, 929 (4th Cir. 1995); *see also United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 462 (7th Cir. 2006) (holding that the entrapment doctrine does not apply to venue, and that the proper remedy for prosecutorial forum shopping is Federal Rule of Criminal Procedure 21(b)).

**[2]** Although we have not yet adopted a similar holding rejecting manufactured venue in this circuit, we need not decide the issue today. We have noted that *Archer* "cannot offer . . . generally applicable principles" and that it has been limited to cases involving "extreme" law enforcement tactics. *United States v. Bagnariol*, 665 F.2d 877, 898 n.15 (9th Cir. 1981). We find nothing "extreme" about an ICE undercover operation, based in San Diego, deciding to cash Kuok's money order in a bank in San Diego. Therefore, because part of the conduct that formed the offense occurred in the Southern District of California, even if that conduct was performed by an undercover government agent, venue there was proper.

## B

Kuok argues that the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, invalidly delegates legislative authority. Section 2778(a)(1) of Title 22 provides:

> In furtherance of world peace and the security and foreign policy of the United States, the President is authorized to control the import and the export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services. The President is authorized to designate those items which shall be considered as defense articles and defense services for the purposes of this section and to promulgate regulations for the import and export of such articles and services. The items so designated shall constitute the United States Munitions List.

22 U.S.C. § 2778(a)(1); *see* 22 C.F.R. § 121.1 (setting forth the U.S. Munitions List). Section 2778(b)(2) provides that "no defense articles or defense services designated by the President [on the U.S. Munitions List] may be exported or imported without a license." 22 U.S.C. § 2778(b)(2). Any person who violates § 2778(b)(2), or "any rule or regulation issued under th[at] section," may be fined not more than $1,000,000 or imprisoned for not more than 20 years, or both. *Id.* § 2778(c). Kuok argues that Congress, in enacting the AECA, failed to "clearly delineate[ ] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (internal quotation marks omitted).

The argument is easily answered. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1. From this language and first principles of separation of

powers, the Supreme Court has announced a nondelegation principle: "Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. United States*, 500 U.S. 160, 165 (1991). Accordingly, when "Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform.' " *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

**[3]** The AECA authorizes the President to maintain the United States Munitions List, which consists of "those items which shall be considered as defense articles and defense services." 22 U.S.C. § 2778(a)(1). Although the defining principle for "articles" and "services" has not been set forth with particularity, it is intelligible: the President is to designate those articles or services "which shall be considered as defense articles and defense services." *Id.* Articles or services that are not regarded as belonging to defense may not be so designated. Furthermore, Congress prefaced the delegation to the President by referring to its shared interest in the "furtherance of world peace and the security and foreign policy of the United States." *Id.* The "[d]elegation of foreign affairs authority is given even broader deference than in the domestic arena." *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1438 (9th Cir. 1996).

**[4]** The Supreme Court rejected a similar nondelegation challenge in *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936). Congress had authorized the President to prohibit the sale of "arms and munitions of war in the United States to those countries now engaged in armed conflict in the Chaco." *Id.* at 312 (internal quotation marks omitted). Congress made it a criminal act to violate the President's prohibition. The Supreme Court recognized that it was "dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very

delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." *Id.* at 319-20. The Court commented on the "unwisdom of requiring Congress in this field of governmental power to lay down narrowly definite standards" and declined to "condemn[ ] legislation like that under review as constituting an unlawful delegation of legislative power." *Id.* at 321-22; *see id.* at 329 ("[T]here is sufficient warrant for the broad discretion vested in the President to determine whether the enforcement of the statute will have a beneficial effect upon the re-establishment of peace . . . ."). This logic applies with equal force to the present case. The AECA does not violate the constitutional prohibition on delegation of legislative power.

## III

We next address Kuok's argument that the district court lacked jurisdiction over count four of the indictment, which arises under the money laundering statute, 18 U.S.C. § 1956.[5] We review jurisdictional questions de novo. *See United States v. Moncini*, 882 F.2d 401, 403 (9th Cir. 1989).

**[5]** Section 1956(a)(2) of Title 18 prohibits the transmission of funds from a place outside the United States to a place inside the United States with the intent to promote the carrying on of specified unlawful activity. The government's theory at trial was that Kuok violated this provision by transmitting funds in exchange for the Taclane encryptor, in order to promote the violation of export control laws and anti-smuggling laws. Section 1956 comes with its own restriction on any assertion of extraterritorial jurisdiction. It provides:

---

[5]Kuok also contends that count four, as charged, presents a merger problem. *See United States v. Santos*, 553 U.S. 507 (2008). Because we agree with Kuok on the jurisdictional issue, we do not reach the merger issue.

There is extraterritorial jurisdiction over the conduct prohibited by this section if—

> (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

> (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

18 U.S.C. § 1956(f).

**[6]** At trial, the government established that the relevant conduct occurred in part in the United States. But the government did not establish that the transaction involved funds of a value exceeding $10,000. Rather, the evidence established —and the government concedes—that the transaction involved a total value of only $5,400.

The government attempts to bypass subsection (f) entirely by arguing that subsection (f) is only invoked when the case involves *purely* extraterritorial conduct. The government argues that Kuok's case, because it involves conduct that occurred in part in the United States, does not invoke extraterritorial jurisdiction at all, arguing that the issue of "extraterritorial jurisdiction" arises only if *no* part of the offense occurred in the United States.

**[7]** The government's argument would render subsection (f) a nullity. If the government were correct that subsection (f) can only be invoked in cases that involve conduct taking place *entirely* outside of the United States, the second part of subsection (f)(1) would be meaningless, and proscribe no possible set of conduct. That is, if "extraterritorial jurisdiction" only need be invoked when prohibited conduct by a non-U.S. citizen occurred entirely outside the United States, the state-

ment in § 1956(f)(1) ("There is extraterritorial jurisdiction over the conduct prohibited by this section if . . . in the case of a non-United States citizen, the conduct occurs in part in the United States") could never be invoked. We presume that Congress did not intend to enact a literally meaningless statute. Because the government failed to satisfy the amount-in-controversy requirement of § 1956(f)(2), Kuok's conviction on count four must be vacated for lack of jurisdiction.

IV

We now turn to Kuok's conviction on count three. Count three arises under the AECA and its implementing regulations, specifically 22 C.F.R. § 127.1(a)(1). The government charged Kuok with violating the AECA by asking the undercover agent to send him the Taclane encryptor in exchange for a $1700 wire transfer. Kuok challenges his conviction on the grounds that the AECA and its implementing regulations do not create liability for attempting to cause another person to violate the AECA.[6] We review de novo. *See United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc).

**[8]** Section 127.1(a)(1) makes it unlawful "[t]o export or attempt to export from the United States . . . by a U.S. person of any defense article . . . or by anyone of any U.S. origin defense article . . . for which a license or written approval is required . . . without first obtaining the required license." 22 C.F.R. § 127.1(a)(1). Kuok notes that the government's evidence did not establish that he exported or attempted to export the Taclane encryptor. Rather, the government's theory was that he attempted to cause an undercover ICE agent to export the encryptor. Kuok then argues that § 127.1(a)(1) does not make it illegal to *cause* a "U.S. person" to "export or attempt to export" a defense article. In response, the government points to 18 U.S.C. § 2(b), which states: "Whoever willfully

---

[6]Because of our resolution, we do not reach Kuok's other arguments pertaining to count three.

causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

**[9]** By overlaying § 2(b) on 22 C.F.R. § 127.1(a)(1), it becomes clear that § 2(b) prohibits causing an export or an attempted export: an export or an attempted export is an "act . . . which if directly performed by [Kuok] would be an offense against the United States." However, the government's case at trial did not establish that Kuok *caused* an *attempt* to export: it established that he *attempted* to *cause* an export. That is, Kuok attempted to cause the undercover ICE agent to export the encryptor without a license. Neither an export nor an attempted export occurred: the ICE agent did not form the mens rea sufficient for an illegal export or an attempt, because he was an undercover agent working for the government the whole time. Kuok, for his part, intended to import the device into Macau, not export it from the United States. *See* 22 C.F.R. § 120.17(a)(1) (defining "export" as "[s]ending or taking a defense article out of the United States in any manner"). Rather, there was an attempt to cause an export: Kuok tried to get the undercover agent to export the encryptor.

**[10]** We have long recognized that "[t]here is no general federal 'attempt' statute. A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribes an attempt." *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983); *see also United States v. Joe*, 452 F.2d 653, 654 (10th Cir. 1972) ("[I]t is well settled that the only attempts to commit crimes which are made Federal crimes are those specifically so proscribed by Federal law."); *United States v. Padilla*, 374 F.2d 782, 787 n.7 (2d Cir. 1967) ("[U]nlike many state criminal codes, federal criminal statutes contain no general attempt provision. An attempt to commit a federal crime is punishable only where the section defining the crime specifically includes an attempt within its proscription." (cita-

tions omitted)). For the government's theory to be viable, therefore, either 18 U.S.C. § 2(b) would have to contain an attempt provision, or 22 C.F.R. § 127.1 would have to contain an attempted causation provision. Since neither statute does so, Kuok cannot be convicted on this count based on the government's evidence at trial. The government's argument that attempt should rationally be read into § 2(b) fails in light of the rule against reading an attempt into a criminal statute that does not explicitly include it.

The government cites to *United States v. Giese*, in which we approved an indictment charging that the defendant "conspired 'to commit and cause to be committed certain offenses against the United States.' " 597 F.2d 1170, 1179-80 (9th Cir. 1979). The reasoning in *Giese* is not analogous here because, unlike for attempt, there does exist a general federal statute for conspiracy. *See* 18 U.S.C. § 371. Thus, for example, conspiracy to cause an export or attempted export would be a federal crime.

The United States also points to cases from the Sixth and Eighth Circuits which approve of an "attempt to cause" theory. In *United States v. May*, the defendant placed a call to a retired general, asking him to destroy certain records. 625 F.2d 186, 194 (8th Cir. 1980). The general attempted to do so by calling a friend, but the attempt failed when his friend refused. *Id.* May was then charged with " 'unlawfully attempt(ing) to cause to have concealed, obliterated, or destroyed' government records" in violation of 18 U.S.C. § 2071. *Id.* We do not find *May* persuasive on this issue, because, while the indictment may have charged "attempting to cause," it is clear that May's actions in that case actually constituted "causing an attempt": that is, May caused the retired general to attempt to violate 18 U.S.C. § 2071. The *May* court correctly characterized May's position as arguing that " 'causing' an attempt is not prohibited by the statute," and relied on § 2(b) to reject this proposition, noting that "section 2(b), like section 2(a), is applicable to the entire criminal code." *Id.* (internal quotation

marks omitted). This reasoning, however, is not helpful for purposes of the present case: even if § 2(b) is applicable to the entire criminal code, there is no general federal attempt provision that would be applicable to § 2(b).

Similarly, *United States v. Zidell* affirmed the defendant's conviction on the charge of "attempt[ ] to cause the possession with intent to distribute methamphetamine," but it is clear that this case also deals with causing an attempt, rather than attempting to cause. 323 F.3d 412, 424-25 (6th Cir. 2003) (emphasis removed) (internal quotation marks omitted). In *Zidell*, the defendant, living in Texas, received a visit from his co-conspirators from Tennessee. He distributed methamphetamine to both of them, and sent them on their way back to Tennessee. *Id.* at 421-22. As the court explained, "[t]his conduct gave rise to an attempt charge, as opposed to a charge of a completed drug distribution offense, when [the coconspirators] were stopped by the police before they reached their intended destination." *Id.* at 422. In other words, the defendant caused his coconspirators to attempt to commit a drug distribution crime. Moreover, the defendant in *Zidell* did not even raise a challenge to this language in the indictment: rather, his argument was that venue in Tennessee was improper. *Id.* at 421-25.

Therefore, both *May* and *Zidell* are factually inapposite to Kuok's case: whereas Kuok's attempt to cause illegal activity failed because he was working with an undercover law enforcement officer, the defendants in *May* and *Zidell* successfully caused an attempt because the coconspirators in those cases had each formed the mens rea necessary to charge them with attempt, had the government so chosen. And to the extent *May* and *Zidell* stand for the proposition advanced by the government based on the wording of the indictments, we disagree.

**[11]** We hold that attempting to cause an export of defense articles without a license is not a violation of U.S. law, and vacate Kuok's conviction on count three.

V

**[12]** Kuok challenges his conviction on count two because he argues that the government did not satisfy all of the elements of 18 U.S.C. § 554, which criminalizes smuggling goods into or out of the United States. This count is based on Kuok's purchase of the Taclane encryptor. We do not agree with Kuok's interpretation of the statute, and decline to vacate his conviction on count two.

The relevant section states:

> Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 554(a).

Kuok argues, first, that he never took physical possession of the encryptor, thus making it impossible for the government to satisfy the element that he "bought" it; second, because both Kuok and the undercover ICE agent lacked the intent to export the encryptor, the encryptor was not "intended for exportation"; and third, that since the encryptor was not exported, the government could not satisfy the statutory requirement that the conduct occur "prior to exportation." These arguments present issues of statutory construction, which we review de novo. *Cabaccang*, 332 F.3d at 624-25.

A

**[13]** The indictment charged Kuok with "buy[ing]" the encryptor, but Kuok only wired money to the undercover agent and never actually received the encryptor, since it was never sent. The parties point to two different definitions of the word "buy" that support their respective cases. Kuok cites to one definition of the word indicating that "buy" entails obtaining possession of the item paid for. *See* Shorter Oxford English Dictionary 316 (5th ed. 2002) (defining "buy" as to "[g]et possession of by giving an equivalent, usu. in money; obtain by paying a price"). The government cites to another definition of the word "buy," which includes "to get possession *or* ownership of by giving or agreeing to give money in exchange." *See* Webster's Third New International Dictionary 306 (2002) (emphasis added). Kuok argues that competing definitions render the statutory text ambiguous and require application of the rule of lenity. *See United States v. Santos*, 553 U.S. 507, 513-14 (2008).

**[14]** We think the government has the better argument. Whatever ambiguity appears after consulting dictionaries fades when we construe the statute as a whole. Section 554(a) applies to anyone who "receives, [or] conceals, [or] buys, [or] sells" any merchandise, article, or object contrary to law. If we were to adopt Kuok's definition of "buy"—requiring receipt or possession—then the term "receive" would become superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). To avoid interpreting one phrase so as to render another superfluous, we accept the government's interpretation of the statute.[7]

---

[7]In reply, Kuok argues that "buy" and "receive" are not superfluous because " 'buy' means to pay for something and obtain possession of it, and 'receive' means to take delivery of something." We do not see the relevance of the difference between obtaining possession and taking delivery of something. Especially in the context of exports from the United States into a foreign country, it can hardly be expected that one could obtain possession of an export without taking delivery of it.

B

**[15]** Kuok argues that § 554(a) requires proof of his "intent to export." The statutory language actually requires that a person buy an item "knowing the same to be intended for exportation contrary to any law or regulation." 18 U.S.C. § 554(a). The mens rea requires only "knowing" the item is intended for export, rather than an "intent to export." Because of the passive construction of the phrase "intended for exportation," no specific actor need form the intent to export the item. Thus, although Kuok was not doing the exporting himself (his scheme involved receiving an import, not sending an export), he certainly intended that another actor (the undercover agent) intend to export the item. In other words, the government's case need not establish that the defendant intended to export the encryptor, because Congress did not specify *who* must form the intent to export the item, only that the defendant know that the item was intended for export contrary to U.S. law.

C

Kuok argues that since the statute applies to "[w]hoever . . . buys . . . such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to" law, *id.*, the government must prove that the item was actually exported, or else the condition "prior to exportation" cannot be satisfied. The government responds that "prior to exportation" simply limits prosecutions to purchases that

Article 2 of the Uniform Commercial Code lends support to our interpretation: it defines the term "buyer" as "a person that buys *or contracts to buy* goods," U.C.C. § 2-103(1)(a) (emphasis added), and the term "receipt of goods" as "taking physical possession of goods," *id.* § 2-103(1)(*l*). The U.C.C. therefore adopts neither Kuok's definition of "buy" nor his proposed distinction between receiving goods and obtaining possession of those goods.

occurred during or before exportation. This is not superfluous with the phrase "knowing the same to be intended for exportation contrary to any law," the government argues, because while the latter phrase does exclude prosecutions from taking place after the exportation has been completed, it does not exclude prosecutions against one who buys an item while it is in transit, whereas the former phrase does.

Alternatively, the government argues that superfluity is not always to be avoided: the "hesitancy to construe statutes to render language superfluous does not require [courts] to avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity." *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

Kuok replies that the portion of § 554(a) under which he was charged lacks an attempt provision, and the government's efforts to charge him under this statute, without proving that an export actually took place, constructively read an attempt provision into it. We do not agree with Kuok, but we do note that the statutory text is challenging to parse. The operative phrase states:

> Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, *or* receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of such merchandise, article or object . . . .

18 U.S.C. § 554(a) (emphasis added). The emphasized "or" above divides this statute into two clauses: the first applying to exporters, and the second to buyers. This might lend support to Kuok's reading; that is, the attempt provision can be read only as far as the "or," and thus applies uniquely to

exporters, not buyers. On the other hand, the reference to "such merchandise" could be read as incorporating the entire exporters clause; that is, "such" merchandise is "merchandise" that has been the object of an "export[ing] or send[ing] from the United States, or attempt[ed] . . . export[ing] or send-[ing] from the United States . . . contrary to any law or regulation." The latter interpretation is persuasive because there is no other phrase in the exporters clause indicating the type of merchandise at issue ("contrary to any law or regulation of the United States" is an adverbial clause modifying the verbs "exports" and "attempts to export," not an adjectival clause modifying the noun "merchandise"). Without a phrase that limits or defines the merchandise, the second clause's use of the word "such" is meaningless.[8]

**[16]** We find that the attempt provision spans the "or." There is no extratextual reason to interpret the statute in a manner that treats exporters and buyers differently, and there are strong intratextual reasons for treating them similarly. Kuok's interpretation of "prior to exportation" "render[s] the entire provision a nullity," and we reject it. *Cf. Atl. Research Corp.*, 551 U.S. at 137. In sum, we have considered Kuok's objections to count two, and have found them without merit.

## VI

Kuok brings multiple challenges to the jury instructions given in this case. We review "de novo whether the jury instructions accurately define the elements of a statutory offense." *United States v. Summers*, 268 F.3d 683, 687 (9th Cir. 2001).

First, Kuok argues that the jury instructions with respect to count two were improper for the same reasons that he argued

---

[8]"Such" in this context means "of the sort or degree previously indicated or implied." Webster's Third New International Dictionary 2283 (2002).

his conviction on count two must be vacated. Because we have rejected his arguments and concluded that Kuok's conviction under § 554(a) need not be vacated as a matter of law, we disagree that the jury instructions were improper.

Second, Kuok argues that the instructions with respect to count one are invalid because they allowed the jury to convict based on the "attempt to cause an export" theory of count three. Instruction 21, relating to count three, states in full:

> Count 3 of the Indictment charges the defendant with attempted export of a defense article without a license. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

> First, on or about April 29, 2009, the defendant intended to commit the crime of willfully causing the export of a KG-175 Taclane Encryptor which was designated on the United States Munitions List, without first obtaining a license or written approval from the Department of State, Directorate of Defense Trade Controls, and,

> Second, the defendant did something which was a substantial step toward committing the crime, with all of you agreeing as to what constituted the substantial step.

> Mere preparation is not a substantial step toward committing the crime of exporting defense articles without a license.

> An act is done "willfully" if it is voluntarily committed with the knowledge that it was prohibited by law and with the purpose of disobeying or disregarding the law. While the government must prove beyond a reasonable doubt that the defendant

intended to violate the law, it is not necessary for the government to prove that the defendant had read, was aware of, or had consulted the specific regulations governing his activities. In other words, in this case, while the government must prove beyond a reasonable doubt that the defendant intended to violate the law, the government is not required to prove that the defendant had read or consulted the United States Munitions List or the specific export licensing requirements of the Arms Export Control Act.

As discussed above, we vacate Kuok's conviction on count three because there is no crime of attempting to cause an export contrary to U.S. law. Kuok argues that his conviction on count one was "tainted" by this invalid offense theory because the instruction on count one refers to the same substantive offense as that in count three (exporting without a license). Instruction 16, relating to count one, states in full:

As mentioned, Count 1 of the Indictment alleges two possible criminal objects of the conspiracy.

The elements of the crime of buying merchandise, articles, or objects prior to exportation, knowing they would be exported contrary to the laws and regulations of the United States are:

First, the defendant knowingly bought merchandise, articles, and objects, prior to exportation, and

Second, at that time, the defendant knew the same to be intended for exportation contrary to any law or regulation of the United States.

The elements of the crime of exporting defense articles without a license are:

First, the defendant exported, or caused to be exported, from the United States an item or items designated on the United States Munitions List;

Second, the defendant did not obtain a license or written approval from the Department of State to export the item or items; and

Third, the defendant acted willfully.

The term "willfully" is defined in Court's Instruction 21.

To willfully "cause" an act to be done means to intentionally bring it about, with knowledge that it is prohibited by law and with the purpose of disobeying or disregarding the law.

There is no taint here. Instruction 21 is invalid because it allowed the jury to convict on an "*attempt* to cause an export" theory, but instruction 16 allowed the jury to convict on a "*conspiracy* to cause an export" theory. We have already concluded that because of the existence of a general federal conspiracy statute, a conspiracy to cause an act to be undertaken is prohibited by U.S. law in a way that an attempt to cause an act to be undertaken is not. *See Giese*, 597 F.2d at 1179-80; *see also* 18 U.S.C. § 371. The cross-reference for the definition of "willfully" does not alter this analysis, as the meaning of the term "willfully" is entirely irrelevant to the question of whether instruction 21 is invalid. This cross-reference does not incorporate the "attempt to cause an export" theory.

Kuok's third argument fails for the same reason. He challenges the correctness of the phrase in instruction 16 indicating that a possible object of the conspiracy for count one was that "the defendant exported, or caused to be exported" a defense article. Kuok argues both that a "causation" theory was not charged in the indictment, and that no authority sup-

ports the causation theory in the context of conspiracy liability. We disagree. "[A]n indictment need not specifically charge . . . 'causing' the commission of an offense . . . to support a jury verdict based upon a finding of [causation]." *United States v. Armstrong*, 909 F.2d 1238, 1241 (9th Cir. 1990) (internal quotation marks omitted). And as discussed above, conspiracy to cause an export is a valid offense theory. *See Giese*, 597 F.2d at 1179-80; *see also* 18 U.S.C. § 371.

## VII

Because we hold that the government's theory on counts one and two is viable as a matter of law, we finish by considering Kuok's claim that he should have been permitted to present evidence of duress to the jury. We review the district court's decision to exclude the duress defense de novo.[9] *United States v. Vasquez-Landaver*, 527 F.3d 798, 802 (9th Cir. 2008).

Duress is not a statutory defense, but a common-law defense that allows a jury to find that the defendant's conduct is excused, even though the government has carried its burden of proof. *See Dixon v. United States*, 548 U.S. 1, 12-14 & n.9 (2006). To establish duress, the burden of proof is on the defendant to show that: (1) he was under an immediate threat of death or serious bodily injury, (2) he had a well grounded fear that the threat would be carried out, and (3) he had no reasonable opportunity to escape. *United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir. 1982); *see also Dixon*, 548 U.S. at 7; *United States v. Bailey*, 444 U.S. 394, 409-10 (1980).

---

[9]After the district court first precluded Kuok's duress defense, Kuok filed a motion to reconsider, which included additional detail and a proffer of his entire defense case. Motions to reconsider are reviewed for abuse of discretion. *Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.*, 5 F.3d 1255, 1262 (9th Cir. 1993). Because we conclude that the duress defense should have been sent to the jury on the basis of the facts presented to the district court before the motion to reconsider, we limit this discussion to those facts and review the legal issue de novo.

"Factfinding is usually a function of the jury, and the trial court rarely rules on a defense as a matter of law." *United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984). Because we consider this defense as a matter of law, we must accept Kuok's proffer as true in its entirety. Here, the parties' dispute concerns the first and the third elements.[10]

A

The threat to Kuok's family was both immediate and serious. According to his counsel's opening statement, Zheng made it clear to Kuok that his family was being monitored, through Zheng's actions in giving Kuok reports on his wife's daily activities, calling her at the family's home phone number, and sending Kuok various pictures of his wife and his son taken in public. When Kuok attempted to get out of his dealings with the government, Zheng explicitly threatened to send Kuok's wife to a "black jail," and told Kuok that this was "somewhere where we take people off the grid if they don't do what we ask them to do."

Our decision in *United States v. Contento-Pachon* is most similar to the present case. In *Contento-Pachon*, a taxi driver was lured into a meeting with a drug dealer when the drug dealer promised him a job driving a private car. 723 F.2d at 693. What the drug dealer actually wanted was a mule to smuggle drugs into the United States. *Id.* The defendant protested, but capitulated in the face of threats to his family. *Id.* The drug dealer revealed that he knew private details about the defendant's life—details that the defendant had never mentioned to the drug dealer. *Id.* We held that this evidence supported a defense of duress because

> [the drug dealer] had gone to the trouble to discover
> that Contento-Pachon was married, that he had a

---

[10]The government does not challenge the sufficiency of Kuok's proffer with respect to the second element of duress.

> child, the names of his wife and child, and the location of his residence. These were not vague threats of possible future harm. According to the defendant, if he had refused to cooperate, the consequences would have been immediate and harsh.

*Id.* at 694; *see also id.* ("Contento-Pachon contends that he was being watched by one of [the drug dealer]'s accomplices at all times during the airplane trip.").

The government contends that the threats to Kuok's family were not "immediate" because Kuok could not demonstrate that "someone was present to enforce the threat immediately during the entire criminal conduct." *United States v. Sawyer*, 558 F.3d 705, 712 (7th Cir. 2009) (coercion over a year-long period was insufficient to prove duress because defendant could not show that someone was present at all times the defendant was involved in illegal activity).

The government cites *United States v. Becerra* in support of its position. 992 F.2d 960 (9th Cir. 1993). In that case, the defendant believed that his family was threatened when an undercover agent said he would "take care" of the defendant's family if the defendant did not go through with various drug transactions. *Id.* at 964. We found that this was not enough, because the threat was not "immediate," even though the undercover agent was "almost constantly" around the defendant. *Id.* The government argues that this indicates that surveillance must rise above the level of "almost constant," but we think this confuses "constant surveillance" with "specificity."

Our case law makes it clear that to be immediate, a threat must be specific: "A veiled threat of future unspecified harm will not satisfy this requirement." *Contento-Pachon*, 723 F.2d at 694 (internal quotation marks omitted) (alteration omitted). To that effect, we rejected the defense in *Becerra*, where the threat to "take care" of the defendant's family did not include

a specific time frame, and lacked detail. 992 F.2d at 964. In *United States v. Karr*, we found that no evidence supported the duress defense when the defendant testified only that "Harry threatened his daughter, his mother and himself." 742 F.2d 493, 497 (9th Cir. 1984). Similarly, in *United States v. Moreno*, we rejected the defense where, "[d]uring [a] three week period, Moreno saw Joker on only three occasions. No one else made any threats or appeared to follow Moreno. Joker did not know Moreno's address, or where in the 'west-side' his daughters could be located." 102 F.3d 994, 997 (9th Cir. 1996). Put simply, vague and undetailed threats will not suffice.

**[17]** Kuok's case is close, but we find that the threats against his family were not vague. Kuok was told his wife would be arrested and disappear into a secret prison if he refused to cooperate. Immediacy is demonstrated by the fact that Zheng clearly indicated that harm to Kuok's wife would be the *specific* and *direct* consequence of refusing to obey the government's commands. It is further supported by the fact that Zheng knew his family's movements and other intimate details that demonstrated that his family was regularly monitored. Kuok believed that Zheng represented the Chinese intelligence service, whose capacity to carry out its threats would be far greater than the run-of-the-mill criminal organization. The vivid detail in Zheng's threat distinguishes it from threats in cases rejecting the duress defense when the defendant received only generic threats against himself or his family.

### B

**[18]** Kuok argues that he had no reasonable opportunity to escape his situation because the government was monitoring him and his family, because he could not turn to the local police for help, and because even if he could leave the country on his travels and seek help from U.S. law enforcement, his family would have remained vulnerable. This issue should

have been submitted to the jury. We have held that the inability to seek help from the local police is a relevant factor in assessing the opportunity to escape. In *Contento-Pachon*, the defendant believed that the police were corrupt and paid off by drug traffickers. 723 F.2d at 693. We held that the case had to be submitted to the jury for it to "decide whether one in Contento-Pachon's position might believe that some of the Bogota police were paid informants for drug traffickers and that reporting the matter to the police did not represent a reasonable opportunity of escape." *Id.* at 694. Here also, a jury should decide whether Kuok, who claims the government itself was threatening him, could not seek aid from local authorities.

Furthermore, the possibility of packing up and moving out of the dangerous environment, abandoning one's work and displacing one's entire family, does not necessarily present a reasonable opportunity for escape. Again, *Contento-Pachon* is instructive: "To flee, Contento-Pachon, along with his wife and three year-old child, would have been forced to pack his possessions, leave his job, and travel to a place beyond the reaches of the drug traffickers. A juror might find that this was not a reasonable avenue of escape." *Id.* Here, Kuok might have been able to escape Macau, but it is less clear that he could have reasonably escaped with his wife and son, and it was their safety that been threatened.[11]

The government contends that if Kuok had an opportunity to notify U.S. law enforcement about his situation, he was required to do so. However, the cases the government cites are inapposite. First, we have not held that a defendant must surrender to authorities after reaching a place of safety, except

---

[11]There is some evidence in the record that Kuok did, in fact, take multiple trips outside Macau, including family vacations. Given the other evidence Kuok proferred, we think this is evidence a jury should consider in assessing the reasonableness of Kuok's duress defense, rather than evidence that precludes his duress defense as a matter of law.

in prison escape cases. *See Bailey*, 444 U.S. at 412-13. Second, the cases upon which the United States relies involve seeking the help of local police. For example, in *Moreno*, we noted that "[u]nlike the defendant in *Contento-Pachon*, . . . Moreno presented no evidence that he could not flee from his gang's reach, or that he could not seek help from local law enforcement agencies because they were corrupt and controlled by gang members." 102 F.3d at 997; *see also United States v. Sixty Acres in Etowah Cnty.*, 930 F.2d 857, 861 (11th Cir. 1991) (holding that the duress defense was insufficient because the defendant did not show he had no reasonable opportunities to inform the police); *United States v. Charmley*, 764 F.2d 675, 676-77 (9th Cir. 1985) (same); *Shapiro*, 669 F.2d at 596-97 & n.4 (same). In any event, the government's suggestion that Kuok should have cooperated with the authorities immediately upon landing in the Atlanta airport may be unreasonable, given that Kuok knew his family was still in danger of being jailed by Chinese government officials beyond the control of U.S. authorities. *See United States v. Otis*, 127 F.3d 829, 835 (9th Cir. 1997) ("The government argues that . . . [the defendant] could have escaped by cooperating with the American authorities. We do not see how protection would have protected his father in Colombia.").

**[19]** In short, the ultimate factfinders may or may not accept Kuok's story, but he has alleged facts sufficient to present his defense to the jury.

## VIII

**[20]** We vacate Kuok's convictions on counts three and four. We remand to the district court for a new trial on counts one and two, with instructions to allow Kuok to present evidence of duress to the jury.

REVERSED; REMANDED.