FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 16-10261 |
|  | D.C. No. 4:14-cr-01750-RCC-DTF-1 |
| v. |  |
| LASHAY MARIE LOPEZ, *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, Chief Judge, Presiding

Argued and Submitted November 17, 2017
San Francisco, California

Filed January 10, 2019

Before: Johnnie B. Rawlinson and Jay S. Bybee, Circuit
Judges, and Paul L. Friedman,[*] District Judge.

Opinion by Judge Bybee;
Dissent by Judge Rawlinson

---

[*] The Honorable Paul L. Friedman, United States District Judge for
the District of Columbia, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated a conviction for false statement during the purchase of a firearm, aggravated identity theft, and felon in possession of a firearm, in a case in which the only issue before the jury was the affirmative defense of duress.

The panel held that expert testimony on Battered Woman Syndrome may be used by a defendant to support her duress defense and rehabilitate her credibility, that the district court therefore erred in precluding the defendant's expert witness from testifying, and that this decision was prejudicial to her defense.

The panel held that the district court did not abuse its discretion by excluding a video of the defendant's entire interview in jail with ATF agents, where the evidence would have consisted nearly exclusively of hearsay statements, including those made by the defendant.

Dissenting, Judge Rawlinson could not say that the district judge abused his discretion in determining that the expert testimony on Battered Woman Syndrome was not admissible in the context of establishing a duress defense, as opposed to the usual context of its admission—to establish self-defense.

The panel remanded for a new trial.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michael L. Burke (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Defendant-Appellant.

Erica Anderson McCallum (argued), Assistant United States Attorney; Robert L. Miskell, Appellate Chief; Elizabeth A. Strange, Acting United States Attorney; United States Attorney's Office, Tucson, Arizona; for Plaintiff-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Defendant-Appellant Lashay Marie Lopez was convicted on three federal charges stemming from her purchase of a firearm through the use of false identification (ID). Because Lopez admitted to the offense conduct, the only issue before the jury was the affirmative defense of duress. Lopez claims that she purchased a handgun for Hector Karaca using her identical twin sister's ID in violation of her probation and federal law because Karaca threatened to harm Lopez and her family if she failed to acquire a gun for him.

In support of her duress defense, Lopez asked the district court to allow her to introduce expert testimony on Battered Woman Syndrome (BWS) and the effects of past abuse. Lopez, who had been physically and sexually abused by her stepfather, contended that this evidence would "help provide context" to the jury regarding her fear of Karaca and why she did not seek help from the police. Lopez similarly asserted

that the expert's description of the "characteristics of [a] domestic violence victim" would help explain her "counterintuitive" behavior regarding Karaca. The court, however, excluded this evidence in a series of oral rulings, concluding that BWS evidence is incompatible with the duress defense's use of an objective reasonable-person standard.

We join the weight of authority in holding that such expert testimony may be used by a defendant to support her duress defense and rehabilitate her credibility. We therefore find that the district court committed legal error in precluding Lopez's expert witness from testifying and conclude that this decision was prejudicial to her defense. Accordingly, we vacate her conviction and remand this case to the district court for a new trial.

## I.  FACTS AND PROCEEDINGS

### A

Lopez, who was twenty-seven years old at the time of the crimes at issue, dated Karaca when the two were teenagers. The relationship ended when Karaca was sentenced to eight-years imprisonment in 2006 for a convenience-store shooting.[1] Karaca was released from prison during the Fall of 2013, but mere weeks later, police were searching for him in connection with a double homicide in Phoenix, Arizona.

In November 2013, Karaca arrived at Lopez's home in Tucson, where she lived with her mother, her identical twin

---

[1]  It was, however, disputed at trial whether the two remained in contact while he was in prison.

sister, her sister's two young children, and a teenage sibling. Karaca and Lopez spoke for several hours and drank together. Karaca eventually admitted to Lopez that night that he was "on the run" from the police due to a shooting and asked her if she knew where he could get a gun. She told him she did not, and Karaca accepted her answer. He later began making sexual advances towards Lopez, suggesting that they restart their relationship. Lopez initially rejected these overtures, telling Karaca that she was currently involved with someone else. Lopez "push[ed] him away" and "told him no . . . but he didn't stop" and "so [Lopez] just gave in." Karaca eventually left without further incident.

Two days later, however, Karaca returned to Lopez's home and again asked her about acquiring a gun. She explained to him at this point that she could not purchase a gun or "be around" one because she was on probation on a felony drug conviction. Karaca responded by grabbing Lopez by the arm and threatening that, if she failed to get him a gun, "he[] [would] come back and shoot up [her] house and he [would] hurt [her] family." Several days later, Karaca returned to Lopez's home and was limping. He told her that he was in a "shootout" in the desert during a drug deal and was shot in the leg. Lopez later testified at her trial that Karaca's reference to a "shootout" made her believe that he already had a gun, which increased her fear that he would harm her family.

Four days later, Karaca returned and demanded that Lopez purchase a gun for him that day from a nearby pawnshop. She again responded that she was on probation. Karaca then insisted that Lopez pose as her identical twin sister during the purchase, demanding that they go to Lopez's home and retrieve her sister's ID. After Lopez made various

excuses as to why she could not obtain the ID that day, Karaca grabbed her again and threatened: "I already told you what I was going to do if you don't get this gun for me. I know you don't want anything happening to your mom or your sisters." The two retrieved the ID and went to the pawnshop that same day, where Lopez purchased a Ruger pistol using the ID and her sister's identifying information. Shortly after she left the store, Karaca grabbed her purse, removed the gun, and walked away.

Two days later, Lopez saw Karaca one last time before her arrest. The two went together to a family barbeque hosted by her twin sister's ex-husband, who was also Karaca's friend. The three left the party at one point to go to the store, where Karaca accused Lopez of flirting with her sister's ex-husband and slapped her in the face. Karaca initially left but eventually returned to the party. Later that evening, Karaca grabbed Lopez's arm and told her he would "f--- [her] up, and no one will do anything about it."

Twelve days after purchasing the gun for Karaca, Lopez met with her probation officer and a U.S. Marshal, who was searching for Karaca. Lopez initially denied knowing Karaca, but after the probation officer found the pawnshop receipt in Lopez's purse, she admitted that she had purchased a gun for Karaca. Lopez also stated she was seeing Karaca romantically, referring to him at one point as "my man." Lopez did not explain to the officers at this juncture why she had bought the gun for Karaca and did not claim that Karaca had threatened her. After refusing to provide them with any specifics on Karaca's location, Lopez was sent to jail. She later explained at trial that she was afraid that Karaca would harm her if he discovered she had spoken to the authorities.

The following day, two agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) interviewed Lopez in a private room in the jail. For the first time, Lopez claimed that she had purchased the gun for Karaca because he had threatened her and her family. She also informed the agents that Karaca had told her he had another gun. At trial, Lopez claimed that she only told the ATF agents these details—as opposed to her probation officer the previous day—because she felt "safer in the jail": "[Karaca] can't get me when I'm . . . in jail. There is no way of him getting ahold of me and finding out what I'm saying" to the agents. Shortly thereafter, the police located Karaca in Tucson. He stole a vehicle using the gun purchased by Lopez and led the police on a lengthy car chase, which ended with Karaca taking his own life.

B

In late 2014, Lopez was indicted on three federal charges: (1) false statement during the purchase of a firearm under 18 U.S.C. §§ 922(a)(6), 924(a)(2); (2) aggravated identity theft under 18 U.S.C. §§ 1028A(a)(1), (c)(3); and (3) felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1), 924(a)(2). The case proceeded to a jury trial. Lopez stipulated to many of the elements of these offenses and conceded that she purchased the firearm using the false ID. Her trial strategy thus consisted entirely of proving that she acted under duress as a result of Karaca's threats against her and her family.

"Duress is not a statutory defense, but a common-law defense that allows a jury to find that the defendant's conduct is excused, even though the government has carried its burden of proof." *United States v. Kuok*, 671 F.3d 931, 947 (9th Cir.

2012). In order to establish the defense, a defendant bears the burden of proving three elements by a preponderance of the evidence: "(1) [s]he was under an immediate threat of death or serious bodily injury, (2) [s]he had a well grounded fear that the threat would be carried out, and (3) [s]he had no reasonable opportunity to escape." *Id.*; *see also United States v. Navarro*, 608 F.3d 529, 532 (9th Cir. 2010); *United States v. Johnson*, 956 F.2d 894, 897 (9th Cir. 1992), *superseded by regulation on other grounds*; *United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984)). If successful, a defendant is "legally excuse[d]" of the crime committed and must be found not guilty. *Navarro*, 608 F.3d at 532–33.

Prior to trial, Lopez advised the district court of her intent to introduce testimony from Dr. Cheryl Karp, an expert "on issues of trauma, domestic violence, and victim behaviors." Lopez asserted that Dr. Karp's testimony would assist the jury "in understanding the evidence because . . . the trial [would] involve evidence as to coercion and threats of violence leading up to the day Karaca took her from her home and forced her to purchase a firearm for him." Lopez further contended that Dr. Karp's testimony regarding "behaviors of victims of domestic violence" would "help provide context" to her duress defense, including whether her fear of Karaca was "well-grounded" and whether she had a "reasonable opportunity" to escape from him. Finally, Lopez asserted that Dr. Karp's testimony would "liken to that of standard government expert testimony in a domestic violence case where there is the counter-argument that the victim's behavior was not consistent or credible victim behavior."

The government moved in limine to exclude this testimony, primarily arguing that the testimony would be

irrelevant because the duress defense applies an objective standard. In an oral ruling, the district court described the issue as "pretty close" but ultimately granted the government's motion: "I don't see how [Dr. Karp] can do anything to tell this jury how a reasonable person would have acted under the circumstances, so I'm not letting her in for that purpose." Lopez moved for reconsideration at several points during trial, which the court orally denied each time. The district court did, however, instruct the jury on the duress defense and permitted Lopez herself to testify about how her experience as an abuse victim influenced her interactions with Karaca.

After the jury rendered a guilty verdict on all counts, Lopez moved for a new trial, arguing in part that the preclusion of Dr. Karp's testimony prejudiced her defense. Included with the motion was Dr. Karp's affidavit, in which she provided more detail as to her intended testimony. Specifically, Dr. Karp asserted that "[t]he jury [did] not have the proper knowledge base to understand some of the psychological explanations as to the dynamics involved in Battered Woman Syndrome and why Battered Women remain with abusive men, including the theory of Learned Helplessness." She further attested that her "testimony would also have given the jury an opportunity to hear from an expert on Trauma and how that may have influenced [Lopez's] feelings when she did not seek the help of the police, given her own trauma history of being sexually abused by her stepfather and the police never protecting her." The court denied the motion in an oral ruling.

The court eventually sentenced Lopez to a combined 30-months imprisonment. Lopez filed a timely appeal, and we have jurisdiction under 28 U.S.C. § 1291.

## II.  ANALYSIS

Lopez claims that two erroneous evidentiary rulings prejudiced her duress defense.  First, she argues that the district court erroneously excluded Dr. Karp's testimony regarding BWS.  Because we hold that the district court committed reversible error by barring this expert testimony, we devote the bulk of our discussion below to addressing why such evidence is generally admissible.  We then conclude by briefly addressing (and ultimately rejecting) Lopez's separate argument that the district court erred by excluding a video of her entire interview in jail with the ATF agents.[2]

### A

Lopez argues that Dr. Karp's testimony supports two elements of the duress defense:  (1) whether Lopez had a *well-grounded* fear that Karaca would harm her and her family if she refused to purchase a gun for him and (2) whether she had a *reasonable* opportunity to escape from him by calling the police.  The government continues to counter that BWS evidence is incompatible with a duress defense

---

[2]  Lopez also claims that the government engaged in prosecutorial misconduct during its cross examination of her by stating, in response to one of her answers, "Well, that's just a lie right now" and, at several other points, "Does that make sense?"  Although the district court gave the jury a curative instruction—"that what the lawyers said in their questioning and cross-examination is not evidence"—Lopez contends that the court should have cited the prosecutor's specific comments.  On appeal, the government concedes that the "that's just a lie" comment was improper but contends that the curative instruction was sufficient and that any potential error was harmless.  Given the government's concession and the fact that we are remanding for a new trial, we need not address this claim.  Similarly, we also decline to address Lopez's claim of cumulative error.

because both aforementioned elements assess objective reasonableness. *See United States v. Willis*, 38 F.3d 170, 176 (5th Cir. 1994); *Johnson*, 956 F.2d at 898. BWS, the government argues, reflects only a defendant's "subjective vulnerability."

Like the majority of courts that have addressed this question, we are unpersuaded by this proposed distinction. Before turning to these authorities, however, we must first address our decision in *Johnson*, which the government argued before the district court controls this question.[3]

1

*Johnson* involved several female defendants who were convicted for their nominal participation in a violent drug organization. 956 F.2d at 897. Three of the defendants—Wood, Johnson, and Breck—had claimed that they acted under duress from the organization's "kingpin," who threatened and assaulted two of the defendants and their immediate family members. *Id.* at 897–99, 901–02. The district court permitted testimony on BWS from an expert on behalf of Wood, but denied Johnson and Beck the opportunity to call an expert or cross-examine Wood's expert. *Id.* Because the jury nonetheless found all three defendants guilty, "[t]he dominant issue on the appeals of" these

---

[3]    The government sparingly cites *Johnson* on appeal, and it no longer appears to assert that we decided in *Johnson* that BWS supports evidence only of *subjective* reasonableness. But because at least one other court has interpreted *Johnson* in this manner, we must ensure that we are not bound by our prior decision. *See Willis*, 38 F.3d at 175 ("[T]he *Johnson* court found that subjective evidence of the battered woman's syndrome could not be taken into account in determining criminal liability and thus could not upset the convictions.").

defendants was "the duress defense as it interacts with sentencing." *Id*. at 897. Indeed, we remanded these defendants' cases for resentencing, in part, because the district court erroneously believed that it lacked the authority under the sentencing guidelines to depart downward based on duress if a defendant failed to prove the affirmative defense at trial. *Id.* at 900–03.

Before addressing each defendant's claims, we discussed the principles underlying duress generally. We specified that the defense applies an objective, reasonable-person standard:

> The formula is addressed to the impact of a threat of force upon a reasonable person: The fear must be "well-grounded." There must be no "reasonable" opportunity to escape. The formula is in harmony with the analysis of duress in the Model Penal Code which recognizes duress in the use of unlawful force "that a person of reasonable firmness in his [or her] situation would have been unable to resist." American Law Institute, *Model Penal Code* § 2.09(i) (1985).

*Id.* at 898. In determining whether a fear is well-grounded, the jury may "take into account *the objective situation* in which the defendant was allegedly subjected to duress. Fear which would be irrational in one set of circumstances may be well-grounded if the experience of the defendant with those applying the threat is such that the defendant can reasonably anticipate being harmed on failure to comply." *Id.* (emphasis added). In *Johnson*, for instance, there was little doubt that the jury, in assessing the reasonableness of the defendants' fear, could properly consider the fact that the defendants had

witnessed the kingpin commit brutal acts against others. *See*, *e.g.*, *id.* at 898 ("Given the violence that [one defendant] had already observed on the part of [the kingpin], including his putting of dynamite in her housemate['s] . . . mouth, she was under threat of immediate severe physical harm.").

The more difficult question was "whether a *special* vulnerability to fear—a vulnerability *not produced by those persons causing the defendant's criminal action*—may be taken into account." *Id.* at 898 (emphasis added). We noted that, "[a]s a defense to a charge of criminal conduct, such subjective vulnerability has not been admitted." *Id.* Our analysis at this juncture was brief and opaque, however, as we provided no elaboration on what constitutes a special, subjective vulnerability to fear.

Instead, we reasoned that there are factors related solely to *the defendant*—rather than to the coercing, threatening party—that may be considered in the reasonableness inquiry. Relying on the Model Penal Code (MPC), we highlighted "[s]tark, tangible factors," such as a person's "size, strength, age, or health." *Id*. (quoting MODEL PENAL CODE § 2.09 cmt. 3 (AM. LAW INST. 1985)); *see also* MODEL PENAL CODE § 2.09 cmt. 3 ("The ['person of reasonable firmness'] standard is not, however, wholly external in its reference; account is taken of the actor's 'situation,' a term that should here be given the same scope it is accorded in appraising recklessness and negligence."). Indeed, a 5' 3", 100 lbs., 80-year old individual will, all else equal, likely perceive a threat of physical violence differently than a 6' 4", 200 lbs., 25-year old. While we then acknowledged that the MPC did not list "gender as one of the 'stark, tangible factors,'" we assured that our analysis would demonstrate that "there are sets of

circumstances in which gender is also a factor to be considered." *Johnson*, 956 F.2d at 898.

Once we turned to the claims raised by three of the female defendants, it became evident that our mention of "gender" referred to BWS evidence. At trial, one of the defendants, Wood, "buttressed her contention of duress with the" expert testimony of a psychologist who "had substantial experience in dealing with battered women." *Id*. at 899. Summarizing this testimony and the texts the psychologist cited, we explained that BWS

> is a set of psychological and behavioral reactions exhibited by victims of severe, long-term, domestic physical and emotional abuse. L. Walker, *The Battered Woman Syndrome* (1984). Battered woman syndrome is not a mental disease or defect; rather, battered woman syndrome is a post-traumatic stress disorder. Its psychological effects are often similar to the effects of imprisonment on kidnap victims and prisoners of war. Once battered women believe themselves to be helpless victims of abusive men, they behave like hostages and link themselves to their captors out of fear that it is the only way to survive. Battered women are unable to respond effectively to violence because they are psychologically trapped in the violent relationship.
>
> Repeated beatings diminish the battered woman's motivation to respond and instill in her a negative belief about the effectiveness of

her actions. This "learned helplessness" keeps the battered woman from leaving her batterer. One of the primary survival skills of battered women is hyperalertness. The battered woman learns to be sensitive to her environment to prevent further violence to herself. The development of survival skills, however, comes "at the expense of escape skills." L. Walker at 33 & 87-89. Society often misinterprets the survival skills of battered women as signs of passivity and weakness coupled with an unwillingness to leave the violent relationship. *Id.* at 33. A common misunderstanding is that the battered woman's responses are indicative of weak character. Rather, these responses must be seen as attempts to cope with the abusive and controlling environment in which she lives and from which she is helpless to escape.

*Id*.

Although the duress defense did not sway the jury, we held that the district court "should properly consider the individual before the court and her particular vulnerability" *in sentencing. Id.* BWS evidence, we concluded, "has a particular relation to the defense of duress as it has been expanded by the commentary to the Model Penal Code." *Id*. at 900. We highlighted the MPC's citation to "[a] leading authority on the common law [who] added that the defense applies when the defendant is so far 'in thrall to some power' that a legal sanction would be ineffective in controlling any choice that may be made." *Id*. (quoting GLANVILLE WILLIAMS, CRIMINAL LAW: THE GENERAL PART 755–62 (2nd

ed. 1961)); *see also* MODEL PENAL CODE § 2.09 cmt. 2. We described this model of duress as a "substantial expansion of the defense," which we cautioned "may go too far if not linked to gross and identifiable classes of circumstances." *Id*. But we concluded that "[b]attered women are in circumstances forming such a class." *Id*.

Regrettably, our discussion in *Johnson* of BWS provides no guidance on the appropriate role of such evidence in supporting the affirmative defense of duress *at trial*. We noted, without approval or disapproval, that Wood was permitted to call an expert on BWS, who testified not only on BWS generally, but opined that Wood "fitted the profile of a battered woman." *Id.* at 899.

Nor did we add clarity in addressing the claims raised by the other defendants. Johnson claimed that she should have been permitted either to call the same expert as Wood or cross-examine her. *Id.* at 901. We found no abuse of discretion in the exclusion of such evidence because the expert had never examined Johnson and could only have testified as to "a stereotype applied to a case she knew only in the most external way." *Id.*

The third defendant, Breck, also contended that the district court erred in denying her a jury instruction on duress and by precluding her from calling the BWS expert on her own behalf. *Id*. at 902. Unlike the other two defendants who had claimed duress, "Breck began to work for [the kingpin] without any overt threat on his part, and she continued to work for him without such threats being made directly." *Id*. Rather, Breck's defense relied solely on her testimony that she had once seen his bodyguards strike a woman and had "herself heard on numerous occasions from [the kingpin] of

his violent treatment of persons who crossed him." *Id*. We upheld her conviction. Breck, we reasoned, "had not made out a prima facie case of duress because she had made no showing that she could not far earlier have escaped [the kingpin], as she in fact finally did." *Id*. Moreover, the expert witness' "testimony, going to [Breck's] special subjective vulnerability, would not have established the lack of opportunity to escape that the defense of duress requires." *Id*.

Ultimately, we remanded all three defendants to the district court for resentencing. Even though the defendants had not proven their defense of duress at trial, the district court could take into account at sentencing their "subjective vulnerability" and, as appropriate, "depart downwards on the grounds of incomplete duress." *Id*. at 903.

There is language in *Johnson* that lends support to the government's argument here that BWS evidence is incompatible with the duress defense's objective reasonableness standard. *See id.* at 898. But we decline to apply such a broad reading to our brief discussion of the three defendants' evidentiary challenges. Wood *was* permitted the use of an expert to testify at trial as to BWS generally and as to Wood's own profile. *Id.* at 899. Johnson was denied the use of the same expert, in part because she wanted the expert to testify as to *her* motivation, and the expert had never examined Johnson. *Id.* at 901. As to the third defendant, Breck, we held only that she lacked the elements of a prima facie duress defense because she was not actually threatened directly by the drug kingpin and ultimately escaped. *Id.* at 902.

Unfortunately, our *Johnson* decision never elaborated on what it meant for Breck to have had a reasonable opportunity

to escape from the kingpin. We thus have no means of discerning what factors led us to conclude that Breck's duress defense was so lacking in evidentiary support that she failed to make out a prima facie case, nor can we discern how BWS evidence might have influenced those factors. If, for instance, Breck had decided not to call the police at the first opportunity, then a decision holding that BWS evidence was inadmissable in assessing the reasonableness of her decision would certainly be relevant to the case before us. Unfortunately, *Johnson* does not supply these answers. We must, therefore, conclude that our holding was limited to the dearth of duress evidence in Breck's case. We are unwilling to read *Johnson* as establishing a categorical bar on BWS evidence in support of a duress defense at trial; we think that reads too much into *Johnson*. *See United States v. Marenghi*, 893 F. Supp. 85, 93 (D. Me. 1995) ("[T]he admissibility of expert testimony during trial in a duress defense was not squarely before the appellate court in *Johnson*").

Our conclusion is bolstered by *United States v. Homick*, 964 F.2d 899 (9th Cir. 1992), which we decided mere months after *Johnson*.[4] There, a woman and her ex-husband were tried for wire fraud stemming from her falsified affidavit regarding stolen jewelry. 964 F.2d at 901–02. The female defendant claimed that she acted under duress from her ex-husband, and on appeal, contended "that the district court

---

[4] Our conclusion is also consistent with our non-BWS precedent, which has allowed consideration of factors unique to the defendant, rather than the threatening party, in assessing whether the defendant had a reasonable opportunity to escape. *See*, *e.g.*, *Contento-Pachon*, 723 F.2d at 694 (holding that it is the jury's role to "decide whether one in [the defendant's] position might believe that some of the Bogota police were paid informants for drug traffickers and that reporting the matter to the police did not represent a reasonable opportunity of escape").

improperly excluded expert testimony regarding battered woman syndrome and thereby deprived her of her theory of defense." *Id*. at 905. We found no error in this exclusion, as the wiretapped phone calls between her and her ex-husband revealed "[t]here was nothing implicitly or explicitly threatening about [their] conversation[s]" and she "readily agreed" to write the fraudulent affidavit. *Id*. at 906. In reaching this conclusion, we stated that "[t]he battered woman defense is a species of the defense of duress." *Id*. at 905. And, citing to *Johnson*, "[w]e recognize[d] that the unique nature of battered woman syndrome justifies a somewhat different approach to the way we have historically applied" the duress defense. *Id*. *Homick* thus adds little clarity to the proper role of BWS evidence at trial except for this: It demonstrates that we have not viewed evidence of BWS as categorically incompatible with duress. Rather, as in *Johnson*, we rejected the defendant's claim of duress based on the lack of evidence supporting the affirmative defense.

Here, Lopez testified that Karaca—a convicted felon fleeing from the police—threatened to harm her and her family if she failed to comply with his demands and that she feared that he would carry out these threats if she went to the police. Such evidence was more than sufficient to warrant a duress instruction, which Lopez received. We must therefore address the question left unanswered in our prior decisions: what role BWS evidence may play in supporting the affirmative defense of duress.

## 2

We do not begin from a blank slate. Because duress is a common-law defense, state and federal courts have long

opined on its application and parameters. *See Johnson*, 956 F.2d at 897 ("The defense of duress is a common law concept that federal criminal law has incorporated."). Tellingly, the government has cited to only one jurisdiction that categorically bars BWS evidence in the duress context.[5] In *Willis*, the Fifth Circuit held that BWS evidence is "inherently subjective" and thus incompatible with the duress defense's objective, reasonable-person standard. 38 F.3d at 175. The court reasoned that

> [s]uch evidence is not addressed to whether a person of reasonable firmness would have succumbed to the level of coercion present in a given set of circumstances. Quite the contrary, such evidence is usually consulted to explain why this particular defendant succumbed when a reasonable person without a background of being battered might not have. Specifically, battered woman's syndrome evidence seeks to establish that, because of her psychological condition, *the defendant is unusually susceptible to the coercion.*

---

[5] Curiously, the government also cites *United States v. Smith*, 987 F.2d 888 (2d Cir. 1993). In that case the district court declined to appoint the defendant a psychiatrist "on the ground that testimony as to [the defendant's] unusual susceptibility to coercion was irrelevant and inadmissible." *Smith*, 987 F.2d at 891. The Second Circuit held this was error: "A psychiatrist might have testified to other issues at trial and sentencing, including that [the defendant's] behavior was not inconsistent with his being under duress. . . . Explaining this behavior might have bolstered the credibility of his duress claim, which was relevant to the jury's determination." *Id.*

*Id*. (emphasis added); *see also United States v. Dixon*, 413 F.3d 520, 523–24 (5th Cir. 2005) (applying *Willis* in a case involving facts similar to the instant case), *aff'd on other grounds*, 548 U.S. 1 (2006).

In contrast, in a recent case the D.C. Circuit observed that "[m]ost courts that have considered th[is] question—especially in recent years—have recognized that expert testimony on battered woman syndrome can be relevant to prove duress." *United States v. Nwoye*, 824 F.3d 1129, 1136 (D.C. Cir. 2016) (Kavanaugh, J.). In *Nwoye*, the D.C. Circuit concluded that "expert [BWS] testimony can help a jury assess whether a battered woman's actions were reasonable." *Id*. Reasonableness, the court explained, "is not assessed in the abstract. Rather, any assessment of the reasonableness of a defendant's actions must take into account the defendant's '*particular circumstances*,' at least to a certain extent." *Id*. at 1137 (emphasis added).

Turning first to whether a defendant who suffers from BWS can have a well-grounded fear that the threat will be carried out against her,**[6]** the court explained that "women in

---

**[6]** The D.C. Circuit describes the duress defense as a two-element test: (1) whether the defendant "acted under an unlawful threat of imminent death or serious bodily injury" and (2) whether "there was no 'reasonable, legal alternative to committing the crime.'" *Nwoye*, 824 F.3d at 1135 (quoting *United States v. Nwoye*, 663 F.3d 460, 462 (D.C. Cir. 2011)). Because the D.C. Circuit has stated that reasonableness is a component of both elements, *id.* at 1137, we interpret this test as the functional equivalent of our own three-part test. Its first element merely combines the question of whether the defendant suffered "an immediate threat of death or serious bodily injury" and whether she had "a well-grounded fear that the threat will be carried out." *Johnson*, 956 F.2d at 897. Moreover, we see no meaningful distinction between whether the defendant had a "reasonable opportunity to escape the threatened harm,"

battering relationships are often 'hypervigilant to cues of impending danger and accurately perceive the seriousness of the situation *before another person who had not been repeatedly abused might recognize the danger.*'" *Id.* (emphasis added) (quoting Lenore E.A. Walker, *Battered Women Syndrome and Self-Defense*, 6 NOTRE DAME J.L. ETHICS & PUB. POL'Y 321, 324 (1992)). Thus, "[r]emarks or gestures that may seem harmless to the average observer might be reasonably understood to presage imminent and severe violence when viewed against the backdrop of the batterer's particular pattern of violence." *Id.*; *see also Marenghi*, 893 F. Supp. at 95 ("Providing the jury with information of specific incidents of abuse while providing no information about how such treatment can, over time, establish a dynamic where the threat of abuse hovers over every interaction between the individuals, even if such threat is not always articulated, would give the jury only half of the story. In effect, [BWS] expert testimony may be characterized as explaining how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment.").

As to the separate inquiry of whether a defendant has a reasonable opportunity to escape the threatened harm, the D.C. Circuit concluded that "battered women face significant impediments to leaving abusive relationships. Most importantly, battered women who leave their abusers risk a retaliatory escalation in violence against themselves or those close to them—sometimes termed 'separation abuse.'" *Nwoye*, 824 F.3d at 1137–38 (quoting Mary Ann Dutton,

---

*id.*, and whether she had a "reasonable, legal alternative to committing the crime," *Nwoye*, 824 F.3d at 1135.

*Validity of "Battered Woman Syndrome" in Criminal Cases Involving Battered Women*, in DEPARTMENT OF JUSTICE, ET AL., THE VALIDITY AND USE OF EVIDENCE CONCERNING BATTERING AND ITS EFFECTS IN CRIMINAL TRIALS pt. I, at 14–15 (1996)). "Expert testimony on those impediments to separation can help explain why a battered woman did not take advantage of *an otherwise reasonable-sounding opportunity* to avoid committing the alleged crime." *Id*. at 1138 (emphasis added). Indeed, a defendant's experiences may lead her to "reasonably believe[] that reporting [the threatening party] to the police (or others) would have been unlikely to result in his immediate arrest and would . . . therefore place[] her at greater risk in the interim." *Id.* at 1139.

As the court in *Nwoye* observed, the majority of courts—federal and state—that have addressed BWS in the context of a duress defense have concluded that such evidence is relevant and may be admitted. *See*, *e.g.*, *Dando v. Yukins*, 461 F.3d 791, 801 (6th Cir. 2006); *United States v. Ramirez*, 87 Fed. R. Evid. Serv. 1154 (D.P.R. 2012); *United States v. Ceballos*, 593 F. Supp. 2d 1054, 1060–63 (S.D. Iowa 2009); *Marenghi*, 893 F. Supp. at 91–97; *Commonwealth v. Asenjo*, 82 N.E.3d 966, 973–74 (Mass. 2017); *Wonnum v. State*, 942 A.2d 569, 572–73 (Del. 2007); *State v. Williams*, 937 P.2d 1052, 1058 (Wash. 1997) (en banc). *But see United States v. Willis*, 38 F.3d 170 (5th Cir. 1994); *State v. Richter*, 424 P.3d 402 (Ariz. 2018); State *v. B.H.*, 870 A.2d 273 (N.J. 2005).

This analysis of BWS as applied to duress also comports with the way courts have long viewed self-defense, which is similar to duress in that both defenses "require a defendant to demonstrate that she acted reasonably in response to a

reasonable fear of death or bodily injury." *Marenghi*, 893 F. Supp. at 95; *see Nwoye*, 824 F.3d at 1138 ("Our conclusion is further supported by the decisions of the vast majority of courts that have long held that expert testimony on battered woman syndrome can be relevant in the analogous context of self-defense."); *Johnson*, 956 F.2d at 900 ("The majority of state courts that have considered the issue [of BWS] have admitted expert testimony as to the syndrome on behalf of a woman contending that she acted in self-defense."); *see also see State v. Curley*, No. 2016-KP-1708, 2018 WL 3154627, at *8 (La. June 27, 2018); *Commonwealth v. Pike*, 726 N.E.2d 940, 948 (Mass. 2000); *Boykins v. State*, 995 P.2d 474, 476–79 (Nev. 2000); *People v. Humphrey*, 921 P.2d 1, 8–9 (Cal. 1996); *People v. Wilson*, 487 N.W.2d 822, 823–24 (Mich. Ct App. 1992).

In *People v. Humphrey*, the California Supreme Court concluded that, by admitting BWS evidence in a self-defense trial, it was "not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard." 921 P.2d at 9. Rather, "[t]he jury must consider [a] defendant's *situation and knowledge*, which makes the evidence relevant, but the ultimate question is whether a reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm." *Id*. (first emphasis added). As with duress, "objective reasonableness" for self-defense "must view the situation from the *defendant's perspective*." *Id*. at 8 (emphasis in original). "As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not." *Id*. at 9. "The cyclical nature of an intimate battering relationship enables a battered spouse to become expert at recognizing the warning signs of

an impending assault from her partner—*signs frequently imperceptible to outsiders*." *Id*. at 17 (Brown, J., concurring) (emphasis added) (quotation marks and citation omitted). Thus, "[a]lthough a jury might not find the *appearances* sufficient to provoke a reasonable person's fear, they might conclude otherwise as to a reasonable person's perception of the *reality* when enlightened by expert testimony on the concept of hypervigilance." *Id*. (emphasis in original).

On balance, we are persuaded that expert testimony on how BWS can cause individuals to become hypervigilant to impending harm does not, as the Fifth Circuit perceives, seek to alter the duress defense's reasonable-person standard. *See Willis*, 38 F.3d at 175. The question is still whether or not "a person of reasonable firmness *in [the defendant's] situation* would have been unable to resist." MODEL PENAL CODE § 2.09(1) (1985) (emphasis added). We acknowledge, however, that the "'snapshot' of circumstances" shown to the jury is not limited to just those circumstances existing immediately prior to the commission of the crime. *Marenghi*, 893 F. Supp. 94. This court has long recognized that a defendant's particular situation includes consideration of past experiences. *See Johnson*, 956 F.2d at 898 ("Fear which would be irrational in one set of circumstances may be well-grounded *if the experience of the defendant with those applying the threat* is such that the defendant can reasonably anticipate being harmed on failure to comply." (emphasis added)).

Moreover, BWS evidence is compatible with assessing whether a defendant had a reasonable opportunity to escape from the coercing party. As seen above, this inquiry often focuses on why the defendant did not call the police at the first opportunity. *See, e.g.*, *Kuok*, 671 F.3d at 949;

*Contento-Pachon*, 723 F.2d at 694; *see also Nwoye*, 824 F.3d at 1133. Experts on BWS, however, have explained that:

> The battered woman's perception of viable options for stopping the violence and abuse by any means is not only shaped by her own prior experience with violence, but also influences her future actions in response to violence. The perception or understanding of whether there are options available that would end the violence is based largely on what has actually been learned through experience.

Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 HOFSTRA L. REV. 1191, 1219 (1993). For example, a woman may "'learn[]' during childhood that the police [are] not a viable option to stop the violence even in an immediate situation" if she "observed her mother call the police on many occasions when her father beat her mother, only to hear them say that since the situation was 'a domestic,' they could not intervene." *Id*. at 1220. Indeed, an ineffective attempt to seek help will likely amplify a woman's risk of being harmed. *See id*. at 1119–20; *see also Humphrey*, 921 P.2d at 3 ("[M]any battered women remain in the relationship because of lack of money, social isolation, lack of self-confidence, inadequate police response, and a fear (often justified) of reprisals by the batterer.").

Because an "assessment of the reasonableness of a defendant's actions must take into account the defendant's 'particular circumstances,'" *Nwoye*, 824 F.3d at 1137, a jury may consider the defendant's *prior experience* with police response to abuse in determining whether it was reasonable

for her not to contact them once threatened by the coercing party. We perceive no meaningful distinction between a jury considering such evidence and assessing whether it was reasonable for a defendant not to contact the police due to fear either that close family members will be harmed or that the police are in league with the coercing party. *See, e.g.*, *Kuok*, 671 F.3d at 949–50 ("[T]he government's suggestion that [the defendant] should have cooperated with the authorities immediately upon landing in the Atlanta airport may be unreasonable, given that [the defendant] knew his family was still in danger of being jailed by Chinese government officials beyond the control of U.S. authorities"); *Contento-Pachon*, 723 F.2d at 694 ("The trier of fact should decide whether one in [the defendant's] position might believe that some of the Bogota police were paid informants for drug traffickers and that reporting the matter to the police did not represent a reasonable opportunity of escape."); *see also Nwoye*, 824 F.3d at 1132 ("[The defendant] also testified that she was afraid to report [the coercing party] to the police because [he] had told her that he was a former FBI agent.").

Although a defendant may testify to how her experiences shaped her perceptions, as the defendant was permitted to do in this case, this lay testimony is often insufficient to effectively mount a duress defense. "To effectively present the situation as perceived by the defendant, and the reasonableness of her fear," a defendant must often "overcome stereotyped impressions about women who remain in abusive relationships. It is appropriate that the jury be given a professional explanation of the battering syndrome and its effects on the woman through the use of expert testimony." *Humphrey*, 921 P.2d at 9; *see also Johnson*, 956 F.2d at 899 ("Society often misinterprets the survival skills of battered women as signs of passivity and weakness coupled

with an unwillingness to leave the violent relationship. A common misunderstanding is that the battered woman's responses are indicative of weak character." (citation omitted)). We therefore conclude that expert testimony on BWS is relevant to supporting a defendant's argument that she had a well-grounded fear that she would be harmed if she failed to commit the illegal act demanded of her and that she had no reasonable opportunity to avoid committing the crime.

Beyond directly buttressing the elements of duress, BWS is also relevant to the related issue of rehabilitating a defendant's credibility. *Humphrey*, 921 P.2d at 9; *see also State v. Hennum*, 441 N.W.2d 793, 798 (Minn. 1989) (citing state cases in which "courts have admitted expert testimony on" BWS for, inter alia, "the specific purpose of bolstering the defendant's position and lending credibility to her version of the facts"). Courts addressing "psychological states analogous to BWS, such as rape trauma syndrome and child sexual abuse accommodation syndrome, . . . have generally held expert opinion admissible for" the purpose of "disabus[ing] the jury of some widely held misconceptions about [the] victims, so that it may evaluate the evidence free of the constraints of popular myths." *Humphrey*, 921 P.2d at 15 (Brown, J., concurring) (quotation marks and citations omitted). To this end, "[j]urors faced with testimony from a battered woman concerning her abuse and its effects may doubt the testimony because they do not believe that a woman subject to such abuse would stay with her abuser without alerting police or others." *Nwoye*, 824 F.3d at 1140. "Expert testimony on battered woman syndrome" can help "dispel the ordinary lay person's perception that a woman in a battering relationship is free to leave at any time." *Id*. (quoting *Humphrey*, 921 P.2d at 9).

Moreover, BWS testimony can provide juries an understanding of why victims of abuse sometimes make inconsistent statements or act in ways that appear counterintuitive to a layperson.  For instance, in *Arcoren v. United States*, the key witness recanted at trial her prior grand jury testimony that her husband, the defendant, had raped her. 929 F.2d 1235, 1238 (8th Cir. 1991).  The *government* then moved to introduce expert testimony on BWS.  It argued, and the Eighth Circuit agreed, that such evidence would aid the jury in determining the defendant's credibility by providing the jury an explanation for the victim's change in testimony. *Id.* at 1239.  "As the [expert] witness told the jury, [BWS] is a psychological condition, which leads a female victim of physical abuse to accept her beatings because she believes that she is responsible for them, and hopes that by accepting one more beating, the pattern will stop."  *Id.* at 1240.  The expert testimony thus "provided the jury with information that would help it to determine which" version of the victim's "testimony to credit."  *Id*.  Similarly, in the context of a child-abuse prosecution, we held that expert testimony on such abuse had "significant probative value in that it rehabilitated (without vouching for) the victim's credibility after she was cross-examined about the reasons she delayed reporting and about the inconsistencies in her testimony."  *United States v. Bighead*, 128 F.3d 1329, 1331 (9th Cir. 1997).  Expert testimony on BWS could likewise rehabilitate the testimony of a domestic-abuse victim in cases of duress, regardless of whether she is the defendant or a government witness.

With this understanding of the appropriate role of BWS evidence in raising the affirmative defense of duress, we turn to the expert evidence proffered in this case.

3

Although Lopez's proffer of Dr. Karp's proposed testimony—before trial, during trial and in her motion for a new trial—was fairly cursory, it is evident that the testimony would have comported with the permissible uses of BWS evidence. Dr. Karp attested that her testimony "would have provided the jurors with information about . . . what the dynamics of the 'hypervigilant' behaviors experienced by abused women . . . are in deciding the dangerousness of the situation." If jurors harbored any doubt that Lopez had a *well-grounded* fear that Karaca would harm her and her family if she failed to purchase a gun for him, this testimony may have helped them understand why she "accurately perceive[d] the seriousness of the situation before another person who had not been repeatedly abused might recognize the danger." *Nwoye*, 824 F.3d at 1137 (citation omitted).

Moreover, Dr. Karp's testimony would have supported Lopez's contention that she had no reasonable opportunity to escape from Karaca. Lopez testified at trial that her stepfather beat her, her mother, and her sisters on a near daily basis and also sexually assaulted her. The police would often "take the report and leave," and after one of the few occasions they arrested her stepfather, "he was out the next day" and "broke into the house." Lopez attributed these experiences to why she decided not to call the police after Karaca threatened her, explaining that she feared they would not help her and that Karaca would discover that she had called them. The government attempted to assail this point throughout its closing argument, contending that Lopez's fear "just doesn't make sense" and referring to her explanation as "really incredible." Dr. Karp, however, attested that Lopez's past trauma "may have influenced [Lopez's] feelings when she did

not seek the help of the police, given her own trauma history of being sexually abused by her step-father and the police never protecting her." We, of course, offer no opinion as to whether a jury would believe Lopez or, as the government argues, find her "really incredible," but that is the jury's role. *Kuok*, 671 F.3d at 950. This proposed testimony would have therefore aided the jury in assessing the *reasonableness* of Lopez's decision to buy Karaca the gun and not call the police. *See Nwoye*, 824 F.3d at 1139 ("[The defendant] may have reasonably believed that reporting [the coercing party] to the police (or others) would have been unlikely to result in his immediate arrest and would have therefore placed her at greater risk in the interim. Thus, [her] testimony concerning [his] abuse, supplemented by expert testimony on battered woman syndrome, would have constituted 'sufficient evidence from which a reasonable jury could find' for [the defendant] on a theory of duress.").

Similarly, Dr. Karp's testimony could have rehabilitated Lopez's credibility in light of the government's contention that Lopez complied with Karaca, not out of fear of him, but to keep her "relationship [with him] alive[] [and] to keep her contact with Karaca ongoing." Indeed, the government highlighted the fact that, when confronted by her probation officer, Lopez referred to Karaca as "my man," asserting that this was *why* she bought the gun. This is precisely the type of behavior that might appear outwardly inconsistent with being a victim of domestic violence but can be placed in context through expert testimony "as to the dynamics involved in Battered Woman Syndrome and why Battered Women remain with abusive men."

We garner from the district court's series of oral rulings on the admissibility of Dr. Karp's testimony that the court

perceived the question of admitting the BWS evidence as "close," but ultimately concluded that it was categorically irrelevant to Lopez's duress defense. In light of the foregoing discussion, this was an error of law, which constitutes an abuse of discretion. *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). "A non-constitutional error requires reversal unless there is a 'fair assurance' of harmlessness, or stated another way, unless 'it is more probable than not that the error did not materially affect the verdict.'"[7] *United States v. Torres*, 794 F.3d 1053, 1063 (9th Cir. 2015) (quoting *United States v. Seschillie*, 310 F.3d 1208, 1214 (9th Cir. 2002)). The government argues that the exclusion of Dr. Karp's testimony was harmless, contending that it would have been cumulative of Lopez's own testimony about her past abuse and its effect on her decisions.[8] But as discussed

---

[7] Lopez argues that the exclusion of Dr. Karp's testimony prevented her from raising a complete defense and thus amounted to constitutional error, which requires "the Government [to] convince[] us that the error was harmless beyond a reasonable doubt." *United States v. Stever*, 603 F.3d 747, 757 (9th Cir. 2010). Because we find sufficient prejudice under the less onerous standard for non-constitutional errors, we need not reach this issue.

[8] The government also briefly argues that the testimony should be excluded under Federal Rule of Evidence 403 as unfairly prejudicial because it would "likely . . . elicit a sympathetic emotional response in the jury that would have affected their verdict." We have cautioned, however, "that the exclusion of evidence offered by the defendant in a criminal prosecution under Rule 403 is 'an extraordinary remedy to be used sparingly.'" *United States v. Haischer*, 780 F.3d 1277, 1281 (9th Cir. 2015) (quoting *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995)). Lopez had already testified to the physical and sexual abuse inflicted by her stepfather. The proposed expert testimony would have merely explained how this abuse affected her interactions with Karaca and the police. We perceive no undue prejudice. In any event, that is a matter for the district court to decide.

above, expert testimony on BWS serves an important role in helping dispel many of the misconceptions regarding women in abusive relationships. Such evidence was vital to Lopez's defense, which hinged on persuading the jury that she acted only out of an objectively reasonable fear. We will therefore vacate Lopez's conviction on all counts and remand for a new trial.

* * *

We hold that expert testimony on BWS is not categorically excludable and may be relevant to a defense of duress. We understand that our opinion leaves open many questions concerning the proper scope of an expert's testimony on BWS. These questions will have to be addressed in the first instance by the district court.

B

Finally, we turn to Lopez's argument that the district court erred in excluding the tape of her complete interview with the ATF agents as inadmissable hearsay. Lopez moved the district court several times before and during trial to admit the entire interview, raising numerous theories of admissibility. In her motion for a new trial, Lopez again argued that the entire taped interview should have been admitted. She contended that the ATF agents' statements were non-hearsay because she offered them to show their *effect* on her as the listener rather than for the truth of the matter asserted. For instance, one of the agents told Lopez during the interview that Karaca "is not gonna touch you. He has no power in here. He is gonna be in jail or dead within a week." Lopez argued, as she does on appeal, that such statements would not have been offered to prove that Karaca

could not harm her in jail, but rather to show that the statements had the effect of making her feel safe, which therefore led to her telling the agents about Karaca's threats. Lopez contended that this evidence would have helped her counter the government's argument at trial that the impact of spending a night in jail led to her fabricating a story of acting under duress the very next day. In a brief oral ruling, the court denied the motion for a new trial, merely commenting as to this issue that the statements were "self-serving hearsay."

A district court's evidentiary rulings are reviewed for abuse of discretion, *United States v. Beydler*, 120 F.3d 985, 987 (9th Cir. 1997), as is its denial of a motion for a new trial, *United States v. King*, 660 F.3d 1071, 1076 (9th Cir. 2011). "As a general rule, a party is prohibited from introducing a statement made by an out-of-court declarant when it is offered at trial to prove the truth of the matter asserted." *Torres*, 794 F.3d at 1059. Accordingly, an out-of-court statement is *not* hearsay if offered for any purpose other than the truth of whatever the statement asserts. *See United States v. Sanchez-Lopez*, 879 F.2d 541, 554 (9th Cir. 1989). One common application of this principle is admitting a declarant's out-of-court statement for the purpose of establishing what effect it had on the listener. *See, e.g.*, *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991); 2 MCCORMICK ON EVIDENCE § 249 (7th ed. 2016) (providing examples).

Lopez is correct that the ATF agents' statements would be non-hearsay if considered only in the context of assessing their impact on Lopez—i.e., convincing her that it was safe to speak to the agents about Karaca. This conclusion is underscored by the fact that there would be little relevance to

the truth of the agents' statements that Karaca could not harm Lopez while she was in jail. In contrast, the non-hearsay application of these statements would be relevant to rebutting the government's argument that Lopez's night in jail convinced her to fabricate her duress story.

Nonetheless, the district court did not err in excluding this evidence because Lopez consistently sought to introduce the video of the *entire* interview. This evidence would have undoubtedly consisted nearly exclusively of hearsay statements, including those made by Lopez.[9] There was no abuse of discretion.

## III.  CONCLUSION

The district court abused its discretion in categorically excluding Lopez's expert witness on Battered Woman Syndrome. Because we find that this error prejudiced her defense, we **VACATE** her conviction on all counts and **REMAND** for a new trial.

---

[9] Lopez has not argued on appeal that *her* statements would be non-hearsay (e.g., under the exclusion for prior consistent statements) or would fall under a hearsay exception.

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent. Although I absolutely support the use of expert testimony on Battered Woman Syndrome in appropriate circumstances, I cannot say that the able district court judge in this case abused his discretion in determining that the testimony was not admissible in the context of establishing a duress defense, as opposed to the usual context of its admission - to establish self-defense.

We start from the premise that we owe deference to the district court's evidentiary rulings, particularly in the realm of expert testimony. *See Saravia v. Sessions*, 905 F.3d 1137, 1141 (9th Cir. 2018) ("Abuse-of-discretion review is highly deferential to the district court. . . .) (citation omitted); *see also Skidmore v. Led Zeppelin*, 905 F.3d 1116, 1136 (9th Cir. 2018) ("District courts have broad discretion in making evidentiary rulings, including whether to allow expert testimony. . . .) (citation and internal quotation marks omitted).

A district court abuses its discretion if it commits an error of law or "reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." *Kode v. Carlson*, 596 F.3d 608, 612 (9th Cir. 2010) (citation omitted); *see also Mujica v. Airscan, Inc.*, 771 F.3d 580, 589 (9th Cir. 2017) (same). If the district court commits no error of law "[t]he abuse of discretion standard requires us to uphold a district court determination that falls within a broad range of permissible conclusions." *Kode*, 596 F.3d at 612 (citation omitted). In my view, the district court's decision to exclude the evidence was based on such a "permissible conclusion" that the evidence was inadmissible. *Id.*

The proposed testimony from Dr. Cheryl Karp focused on the defendant's history of having been "sexually abused by her step-father and the police never protecting her." However, our precedent has not characterized evidence of this nature as relevant to a duress defense.

In *United States v. Homick*, 964 F.2d 899, 905 (9th Cir. 1992), we recognized that the battered woman defense "is a species of the defense of duress." In that case, the defendant sought to have expert testimony admitted to establish that her ex-husband, who was charged with the murder of the victims, coerced her into participating in the charged offenses through "his complete domination over her." *Id.* at 902, 905. We ultimately concluded that any error in excluding the proffered expert testimony was harmless because the two recorded telephone conversations between the defendant and her ex-husband reflected ready acquiescence, with "nothing implicitly or explicitly threatening about either conversation." *Id.* at 906.

Notably, in *Homick* we addressed battered woman syndrome in the context of a defense tethered to the co-perpetrator, who was alleged to be the duressor. *See id.* at 902, 905. Similarly, in *United States v. Johnson*, 956 F.2d 894 (9th Cir. 1992), *superseded on other grounds in Martinez v. Martinez*, 369 F.3d 1076, 1089 (9th Cir. 2004), we considered the duress defense in the context of women convicted of drug offenses, who asserted that the drug kingpin for whom they worked abused and "psychologically threatened" them. *Id.* at 901–02. We phrased the issue in the following manner: "The question, relevant to the defense of duress in the cases before us, is whether a special vulnerability to fear—a vulnerability not produced by those persons causing the defendant's criminal action—may be

taken into account." *Id*. at 898. We resolved the issue by answering the question in the negative: "As a defense to a charge of criminal conduct, such subjective vulnerability *has not been admitted*." *Id.* (emphasis added).

In other words, we held in *Johnson* that evidence of subjective vulnerability "not produced by" the named duressor is not admissible to establish the affirmative defense of duress. *Id*. Rather, such evidence may be used at sentencing. *See id*. ("[A] purely subjective element that cannot be taken into account in determining criminal liability may be taken into account in sentencing. . . .") (citations omitted).

The real takeaway from our holding in *Johnson* is that the expert testimony addressing Battered Woman Syndrome must address vulnerability "produced by" the named duressor. *Id*. And that holding, in my view, solidifies why the district court in this case acted within its discretion by excluding the proffered expert testimony. As discussed, the record reflects only that the testimony would focus on the defendant's history of having been "sexually abused by her step-father and the police never protecting her." Because her step-father was not the named duressor for the crime for which she was on trial, our reasoning in *Johnson* rendered the district court's exclusion of the proffered evidence a "permissible conclusion" under our precedent. *Kode*, 596 F.3d at 612.

The majority seeks to avoid our holding in *Johnson* by expressing its "unwilling[ness] to read *Johnson* as establishing a categorical bar on [Battered Woman Syndrome] evidence in support of a duress defense at trial." *Majority Opinion*, p.18. But *Johnson* does not purport to establish a categorical bar on Battered Woman Syndrome

evidence. Rather, it limits admissibility of that evidence to circumstances where the individual producing the vulnerability to duress is the same as the named duressor for the offense being defended. *See Johnson*, 956 F.3d at 898. And as a three-judge panel, we are bound to follow the precedent of our court, no matter how unwilling we may be to hew to our past decisions, or how unpalatable the result may be. *See Lair v. Bullock*, 798 F.3d 736, 747 (9th Cir. 2015), *as amended* ("[W]e are bound by a prior three-judge panel's published opinions . . .") (citing *Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003 (en banc)).

The majority also relies on *Homick* to bolster its disregard of our analysis in *Johnson*. *See Majority Opinion*, pp. 18–19, 39. But as the majority must acknowledge, "*Homick* . . . adds little clarity to the proper role of [Battered Woman Syndrome] evidence at trial . . ." *Majority Opinion*, p.19. Indeed, other than a *cf.* citation to *Johnson*, the panel in *Homick* did not grapple at all with the analysis in *Johnson*. Rather, the *Homick* panel resolved the issue by noting that the facts in *Homick* did not "fall within the scope of *any* reasonable approach to the battered woman defense, no matter how we modify the traditional duress standards." 964 F.2d at 905–906 (emphasis added). Nevertheless, it is notable that the *Homick* case fit within the parameters of the *Johnson* analysis: a battered woman defense tethered to the alleged duressor. *See Homick*, 964 F.2d at 902, 905.

The only other circuit to substantively address this issue is the Fifth Circuit.[1] In *United States v. Willis*, 38 F.3d 170,

---

[1] The majority opinion cites to a case from the D.C. Circuit, *United States v. Nwoye*, 824 F.3d 1129 (D.C. Cir. 2016). However, that case addressed the issue in the context of a claim of ineffective assistance of

176 (5th Cir. 1994), the Court relied on our *Johnson* decision to hold that subjective evidence of vulnerability is irrelevant to the duress defense in determining criminal liability. Admittedly, the Fifth Circuit did not acknowledge our explanation that the evidence attesting to subjective vulnerability is only subjective when the "vulnerability is not produced by those persons causing the defendant's criminal action." *Johnson*, 956 F.2d at 898. Nevertheless, the analysis is consistent with *Johnson* because the Fifth Circuit similarly focused on the irrelevance of subjective evidence in meeting the objective standard required to establish a duress defense. *See Willis*, 38 F.3d at 175.

The expert testimony proffered by the defendant in this case hinged on the childhood abuse suffered by the defendant at the hands of her step-father. In an affidavit, Dr. Karp described how she would have testified:

> My testimony would have provided the jurors with information about the cycle of violence, how battered women behave when under duress, and what the dynamics of the "hyper-vigilant" behaviors experienced by abused women, as part of the dynamics of PTSD, are in deciding the dangerousness of the situation.

---

counsel, and says nothing more than that Battered Woman Syndrome evidence "would have entitled [the defendant] to a jury instruction on duress." *Id*. at 1135. Nothing about that statement is inconsistent with our analysis in *Johnson*, especially considering that the batterer and the duressor were one and the same in *Nwoye*. *See id*. at 1131.

My testimony would also have given the jury an opportunity to hear from an expert on Trauma and how that may have influenced [defendant's] feelings when she did not seek the help of the police, given her own trauma history of being sexually abused by her step-father and the police never protecting her. [Defendant] felt they would not protect her or believe her, given her prior childhood history of trauma and never being "heard" or "protected" by law enforcement. The jury should have been given an explanation by an expert to understand how [Defendant's] childhood abuse influenced her decision-making.

It is enlightening to consider what the expert did say in her affidavit and what she did not say. She did say that the source of Defendant's PTSD was her step-father. She did not say that the source of her PTSD was the named oppressor. In fact, the named oppressor was not mentioned once in the expert's affidavit. She did pinpoint the time of the trauma as Defendant's childhood. She did not point to any trauma during adulthood. Clearly, the focus of the expert was the defendant's childhood, specifically the sexual abuse inflicted upon the defendant when she was a child. This is precisely the type of "subjective vulnerability" evidence that *Johnson* held was *not* relevant to a duress offense. *See* 956 F.2d at 898.

I am not persuaded by the cases cited by the majority, particularly in view of the binding precedent in this circuit that supports the decision of the district court.

In *Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006), the admissibility of similar evidence was decided in the context of a claim of ineffective assistance of counsel, *see id*. at 798. The Sixth Circuit concluded that defense counsel "failed . . . to adequately investigate the availability of a duress defense and the related possibility that [the defendant] suffered from Battered Women's Syndrome." *Id.* However, this Sixth Circuit case actually fits within the holding of *Johnson*, inasmuch as the defendant in *Dando* asserted that her co-perpetrator and duressor were one and the same. *See id*.; *see also Johnson*, 956 F.2d at 898 (explaining that the proffered expert testimony must address vulnerability "produced by" the duressor to be relevant). In any event, the Sixth Circuit expressly noted that the issue of allowing evidence of Battered Woman Syndrome to establish a duress defense had not been "addresse[d] either way" under Michigan law. *See Dando*, 461 F.3d at 801. This case absolutely does not support a conclusion that the district court in our case abused its discretion in disallowing the proffered testimony. Similarly, the non-binding district court case of *United States v. Ramirez*, No. 10-344 (PG), 2012 WL 733973 at *1 involved a co-perpetrator who was also the named duressor, as did the non-binding cases of *United States v. Ceballos*, 593 F. Supp. 2d 1054, 1060–63 (S.D. Iowa 2009); and *United States v. Marenghi*, 893 F. Supp. 85, 97 (D. Maine 1995).

The non-binding state court cases are also singularly unpersuasive because they rely upon state statutes specifically addressing the admissibility of evidence establishing Battered Woman Syndrome. *See Commonwealth v. Asenjo*, 82 N.E.3d 966, 973 (Mass. 2017) ("G.L.C. 233 § 23F, provides the defendant the statutory right to present [evidence of Battered Woman Syndrome]"); *see also Wonnum v. State*, 942 A.2d 569, 573 (Del. 2007) (referencing Del. Code §§ 303 and 304);

*State v. Williams*, 937 P.2d 1052, 1058 (Wash. 1997) (en banc) (involving a statutory duress defense and a co-perpetrator who was also the named duressor). Importantly, the Supreme Court of Arizona, the state where Lopez committed her crime, has recently ruled that similar expert testimony is not admissible under Arizona law. *See State v. Richter*, 424 P.3d 402, 404 (Ariz. 2018).

In sum, none of the non-binding cases relied upon by the majority, singly or in combination, are sufficiently persuasive that the district court was compelled to admit the proffered expert testimony. This is especially true considering that the district court's decision fit squarely within our binding precedent, as the proffered testimony was not linked by the expert to the asserted duressor. *See Johnson*, 956 F.2d at 898 (explaining that the proffered expert testimony must address vulnerabilities that are "produced by" the duressor). And the district court's decision was consistent with precedent from the highest court in the state where the crime was committed. *See Richter*, 424 P.3d at 404.

Under the deferential abuse of discretion standard of review, it cannot be fairly said that the district court committed an error of law, because its decision did not run afoul of any binding precedent, and the non-binding precedent relied on by the majority was singularly unpersuasive. Indeed, the district court's decision was actually consistent with Ninth Circuit precedent and Arizona precedent. Largely for the same reason, the district court's decision was not "illogical, implausible, or without support in the inferences that may be drawn from the record." *Kode*, 596 F.3d at 612. Rather the district court's decision fell "within a broad range of permissible conclusions." *Id.* I would affirm the judgment of the district court.